Yvonne ROGERS, Individually, and as the Executrix of the Estate of Richard Rogers, Deceased, Appellants (Plaintiffs Below),

v.

R.J. REYNOLDS TOBACCO CO., Smith Harris, Inc., Hamilton Harris & Company, Smith Candy & Tobacco Co., Inc., Phillip Morris Incorporated, The American Tobacco Co., Inc., Liggett Group, Inc., Mi–Lo, Inc., and William D. Hamaker, d/b/a Hamaker Pharmacy, Appellees (Defendants Below).

No. 49A02–8904–CV–164.

Court of Appeals of Indiana, Second District.

July 31, 1990.

Rehearing Denied Sept. 24, 1990.

C. Warren Holland, Michael W. Holland, Holland & Holland, and Morris L. Klapper, Klapper & Isaac, Indianapolis, for appellants.

Stephen M. Terry, Baker & Daniels, Wayne C. Kreuscher, Barnes & Thornburg, David O. Tittle, Jon D. Krahulik, Bingham Summers Welsh & Spilman, Douglas J. Hill, Hill Fulwider McDowell Funk & Matthews, and Richard D. Wagner and James G. McIntire, Krieg DeVault Alexander & Capehart, Indianapolis, for appellees.

SHIELDS, Presiding Judge.

### TABLE OF CONTENTS

FACTS ................................................................... 1047
ISSUES ................................................................... 1049
DISCUSSION .............................................................. 1049
 Introduction ......................................................... 1049
 I. Strict Liability and Negligence Claims ............................... 1050
 A. Preemption ................................................... 1050
 1. Failure to Warn ........................................... 1050
 2. Design Defect ............................................. 1051
 B. Statute of Limitations ......................................... 1051
 C. Open and Obvious Rule ........................................ 1052
 D. § 402A Concept of "Unreasonably Dangerous" ................... 1052
 II. Fraud ............................................................. 1055
 III. Intentional Infliction of Emotional Distress ......................... 1056
 IV. Punitive Damages ................................................. 1056
CONCLUSION ............................................................. 1057

Yvonne Rogers, individually and as Executrix of her late husband's estate, appeals an adverse grant of summary judgment on the wrongful death, loss of consortium, and intentional infliction of emotional distress claims against Defendant cigarette manufacturers and distributors (Defendants).

We affirm in part and reverse in part.

### FACTS

The evidence before the trial court at the summary judgment hearing was as follows:

Richard Rogers, Yvonne's deceased husband, was born in 1935. He began smoking discarded cigarette butts when he was five or six years old. As a child he was prompted to smoke by seeing his father, his parents' friends, and movie heroes smoking. He also was aware of athletes promoting the use of cigarettes in advertisements. By the age of five he had heard smoking "stunts your growth." Record at 673. His high school coaches warned smoking affected breathing. Richard's fa-

ther quit smoking when Richard was fifteen. His father told him he quit because he had experienced a "bad hacking fit." Record at 360.

By the sixth grade, Richard was smoking close to a pack of cigarettes a day. At the time he graduated from high school in 1953 and during the two years he was in the army, Richard smoked two packs of cigarettes a day. When he reached his mid-twenties he was smoking about three packs a day. He continued to smoke between two and three packs of cigarettes a day until June 24, 1986, when he was able to quit after receiving a short course of medical treatment consisting of hypnosis and drug therapy. Two months later Richard was diagnosed as having lung cancer.

As early as high school Richard smoked not for pleasure, but because it was a habit he could not break. By the age of twenty-one, he knew heavy smoking posed a greater health risk than moderate smoking. In 1960, when he made his first conscientious but unsuccessful attempts to quit smoking, he realized cigarettes were "more than just habit forming"; they were something he could not "get off of." Record at 671. Starting in 1970, Richard resorted several times to staying in bed all weekend as a method of quitting smoking.

> [W]hat I was trying to do was take myself out of a situation where I did anything where I smoked. If I slept I didn't smoke. If I was in bed I didn't smoke. So the idea was get in bed, do nothing that would prompt you to get a cigarette. If I'd get up, I'd get a cup of coffee and light a cigarette; if I ate, I'd light a cigarette; get a newspaper, I'd light a cigarette. Everything I did was with a cigarette. So what I was hoping to do was immobilize myself for those three days. The idea was if you could go a week, maybe you could make it. I could never get that far.

Record at 720. This method proved unsuccessful for Richard; the first place he would go on the following Monday morning was to a drugstore. In his words, "I had to have that cigarette." Record at 567.

Sometime between 1960 and 1978, Richard attended a meeting sponsored by the American Cancer Society. He described the experience and his reaction to it.

> A. ... [I]t was kind of like an Alcoholics Anonymous format where you'd be teamed up with somebody that you could call if you wanted to get some help, one of those things.

Record at 677.

> Q. .... Why was it that you determined that the program that they offered was not for you?
>
> A. Because I have great willpower [sic]. I can quit smoking any time I want to. That was my thought. But I couldn't.

Record at 682.

In 1964 Richard learned of the link between cigarette smoking and cancer from the widely-disseminated conclusion of the Surgeon General's report on *Smoking and Health*.[1]

> [T]he surgeon general was saying there was a risk of cancer, and that from the first warning, his warnings kept getting stronger and stronger. And the doctors were starting to tell you, don't smoke. Publications were telling you, don't smoke. Newspaper articles were telling you what the surgeon general was saying. He was appearing on television. Hospitals and doctors and clinics were appearing on television saying there was a danger.

Record at 487–88.

> I recall the initial warning coming out saying that they have discovered that cancer was caused by smoking....

Record at 489.

> I think the first word was there was a link between cigarette smoking and cancer.
>
> ....
>
> This is not just TV reports. I mean, it's blasted. When something like that comes out, it's TV, newspapers, people by word of mouth talking about it. It's a

---

1. U.S. Dep't. of Health, Education, & Welfare, *Smoking and Health: Report of the Advisory Committee to the Surgeon General of the Public Health Service* (1964).

widely discussed subject. We're not talking about one isolated newspaper. We're talking about a social concept. Record at 490–91.

Finally, Richard acknowledged the cigarettes he had purchased since the January 1, 1966 effective date of the Federal Cigarette Labeling and Advertising Act [2] bore the required warning labels.

Richard and Yvonne filed their initial complaint on March 7, 1987. Richard died on October 2, 1987. The complaint was subsequently amended to state a wrongful death claim based on the theories of strict liability, negligence and fraud. In her individual capacity, Yvonne sought damages for loss of Richard's consortium prior to his death and for the intentional infliction of emotional injury. Finally, the amended complaint contained allegations of both intentional and wanton and willful misconduct as a basis for punitive damages. The trial court granted summary judgment against Yvonne individually and as personal representative on all counts.

## ISSUES

■ Restated, the issues are: [3]

I. Whether summary judgment in favor of Defendants on the strict liability theory of failure to warn and on the strict liability and negligence theories of failure to design safer cigarettes was appropriate as a matter of law because:

A. the theories are preempted by the Federal Cigarette Labeling and Advertising Act;

B. the causes of action based upon the theories are barred by the applicable statute of limitations;

C. the alleged defects are open and obvious; and

D. cigarettes are not unreasonably dangerous.

2. 15 U.S.C. §§ 1331 *et seq.*

3. Yvonne also asserts the trial court erred in granting Defendants' motions to strike exhibits and affidavits she filed in opposition to the Defendants' motion for summary judgment. Any error is harmless. Defendants have not

II. Whether Defendants are entitled to summary judgment on the fraud, constructive fraud, and fraudulent concealment claims.

III. Whether Defendants are entitled to summary judgment on Yvonne's individual claim for intentional infliction of emotional distress.

IV. Whether Defendants are entitled to judgment on the claims for punitive damages.

## DISCUSSION

### Introduction

■ Defendants argue, "[i]n response to Defendants' motion for summary judgment, *plaintiffs have failed to meet their burden* of producing specific facts to show that cigarettes are defective and unreasonably dangerous." Appellees' Brief at 11 (emphasis added). Defendants cite *Hinkle v. Niehaus Lumber Co.* (1988), Ind., 525 N.E.2d 1243 for the proposition that "the party opposing summary judgment must 'come forth with specific facts showing there is a genuine issue for trial.'" Appellees' Brief at 11 (citing *Hinkle* at 1246). Defendants overlook the well-established rule of Indiana law that such a burden is triggered only when a moving party defendant has first met his or her burden to negate, by material deemed competent by Ind.Trial Rule 56(C), the existence of any issues of fact material to the non-moving plaintiff's claim. This was true in *Hinkle* where the burden had shifted to the non-moving party plaintiff to demonstrate a genuine issue of material fact because deposition testimony established the moving party defendant was unaware of the use to which the allegedly defective product was put, thus negating that essential element of plaintiff's case.

■ Ind.Trial Rule 56 states:

cited to evidence of record (nor do we find any) which negates those allegations of the complaint which the stricken materials were introduced to support. Therefore, our decision assumes the allegations of the amended complaint are true.

(C) .... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, admissions and affidavits filed pursuant to Trial Rule 5(D), together with any testimony show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

\* \* \* \* \* \*

(E) .... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Thus, the moving party carries the burden of making a prima facie showing that there is no issue as to any material fact and that he is entitled to judgment as a matter of law. The moving party must fulfill these two requirements before any burden shifts to the nonmovant. The nonmovant may rest upon his pleadings until the moving party establishes no genuine factual issue exists. *Sprowl v. Eddy* (1989), Ind.App., 547 N.E.2d 865.

Therefore, unless competent evidence of record negates an essential element of the claims, summary judgment is inappropriate on the ground Yvonne, individually and representatively, failed to meet her burden to demonstrate genuine issues of material fact.

When reviewing a grant of summary judgment, we stand in the shoes of the trial court. All evidence must be construed in favor of the nonmovant and all doubts as to the existence of a material issue must be resolved against the movant. *Sprowl.* Therefore, our decision in this case, like

that of the trial court, must rest upon the assumption the factual averments in the amended complaint are true unless they are negated by competent evidence. Further, we, like the trial court, must construe the evidence in favor of the nonmovant. For these reasons, Defendants cannot prevail upon their motion for summary judgment if disputed issues of material fact exist. They can prevail only if the undisputed facts entitle them to judgment as a matter of law.

### I. Strict Liability and Negligence

As argued on appeal, the strict liability claims are based upon the assertions in the amended complaint that the Defendants failed to warn of their cigarettes' propensity to be addictive, in addition to being harmful[4] and failed to design a less addictive cigarette considering its harmful qualities; the negligence claim is based upon the assertion Defendants failed to exercise reasonable care in designing cigarettes.

### A. Preemption

#### 1. *Failure to Warn*

■ The trial court did not err in finding the failure to warn claim is preempted from and after January 1, 1966, the effective date of the Federal Cigarette Labeling and Advertising Act. We are persuaded by the reasoning of *Cipollone v. Liggett Group* (1986), 3rd Cir., 789 F.2d 181, *cert. denied* (1987), 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857, that the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331 *et seq.*, preempts "those state law damage actions relating to smoking and health that challenge ... the adequacy of the warning on cigarette packages." *Id.* at 187.

The holding rests upon the court's construction of the preemption provision contained in 15 U.S.C. § 1334(a)[5] in conjunc-

---

**4.** Yvonne's individual and representative claims include an allegation the cigarettes Richard smoked were harmful. The Defendants failed to present any evidence to negate that allegation. Therefore, for purpose of this decision it is assumed the cigarettes to which Richard asserted he became addicted were harmful.

**5.** "(a) No statement relating to smoking and health, other than the statement required by ... this title, shall be required on any cigarette package." 15 U.S.C. § 1334 (1982).

tion with the policy statement expressed in the Act as amended in 1970:

> It is the policy of the Congress, and the purpose of this chapter, to establish a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby— ... (2) commerce and the national economy may be ... (B) not impeded by diverse, non-uniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health.

*Id.* at 184 (quoting 15 U.S.C. § 1331 (1982)).

We agree that liability imposed on cigarette manufacturers resulting from successful state law tort claims challenging the adequacy of warnings on their products would amount to the imposition of "requirements" which might thwart the express congressional objective of promoting uniformity in warning labels. *Accord, Stephen v. American Brands, Inc.* (1987), 11th Cir., 825 F.2d 312; *Palmer v. Liggett Group, Inc.* (1987), 1st Cir., 825 F.2d 620; *Roysdon v. R.J. Reynolds. Tobacco Co.* (1988), 6th Cir., 849 F.2d 230; *Pennington v. Vistron Corp.* (1989), 5th Cir., 876 F.2d 414.

Therefore, the strict liability failure to warn claim stated in the amended complaint is preempted from and after January 1, 1966, the effective date of the Federal Cigarette Labeling and Advertising Act, and accordingly, the trial court did not err in granting Defendants summary judgment on that claim from and after January 1, 1966.

■ The Act, however, does not provide for a retroactive preemptive effect on the failure to warn claim. Retroactive operation will not be accorded a statute unless its express language indicates the legislature so intended. "There is no language in the Act that even hints at retroactive application, and it surely is not necessary to give the Act retroactive application in order to give it full force or effect."

*Kotler v. American Tobacco Co.* (1988), D.Mass., 685 F.Supp. 15, 18 (citing *United States v. Security Industrial Bank* (1982), 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235). Therefore, the trial court's grant of summary judgment in favor of Defendants on the strict liability failure to warn claim for conduct preceding January 1, 1966 cannot be upheld on preemption grounds.

### 2. *Design Defect*

■ The *Cipollone* court also acknowledged the federal scheme did not eradicate all of plaintiff's claims. On remand, the district court concluded Mr. Cipollone's claims were preempted only if they related "specifically to the matters about which the Court of Appeals expressly found preemption—namely ... the adequacy of [defendants'] warnings." *Cipollone v. Liggett Group, Inc.* (1986), D.N.J., 649 F.Supp. 664, 672.

Therefore, negligence and strict liability claims which assert Defendants failed to expeditiously explore and develop design alternatives which would make their products less addictive do not thwart the Act's purpose of promoting uniformity in warning labels and are not preempted.[6]

### B. Statute of Limitations

■ The applicable statute of limitations also poses no obstacle to the negligence claim and the remaining strict liability claims. The current version of IC 33–1–1.-5–5 (1988) prescribes the limitation period for "any product liability action in which the theory of liability is negligence or strict liability." *See Koske v. Townsend Engineering Co.* (1990), Ind., 551 N.E.2d 437, 442. The decision of *Covalt v. Carey Canada, Inc.* (1989), Ind., 543 N.E.2d 382, precludes a grant of summary judgment in favor of Defendants on the ground that the ten-year statute of repose bars the pre–1966 failure to warn claim or the claims Richard's injury was a result of a design

---

**6.** A defective design is one which makes the product inadequate or unsafe relative to alternate design choices. *See Dias v. Daisy–Heddon* (1979), 180 Ind.App. 657, 390 N.E.2d 222, *transfer denied.*

defect extant in Defendants' products before the time of repose. *Covalt* holds a plaintiff may bring suit within two years after discovering a disease and its cause, notwithstanding that the discovery was made more than ten years after the last exposure to the product that caused the disease.

*Covalt*, 543 N.E.2d at 384.

Defendants urge Richard's cause of action accrued no later than 1960 when he realized he was "addicted." Hence they argue Richard's cause is barred by the two-year limitations period of IC 33-1-1.-5-5 (1988). We disagree. Richard had no knowledge of the ramifications of his addiction in 1960, though he became aware of the possible consequences after he learned in 1964 of the conclusions of the Surgeon General's report published that same year. Nevertheless, his cause of action did not accrue until much later when he discovered he had cancer. The *Covalt* decision holds a plaintiff may bring suit within two years of discovering a "disease *and* its cause." *Id.* at 384 (emphasis added).

The strict liability and negligence claims fall squarely within the *Covalt* rule. Therefore, those claims are not barred by the two-year statute of limitations.

## C. Open and Obvious Rule

■ Defendants argue summary judgment was appropriate on the strict liability and negligence claims because, as a matter of law, the dangers of cigarette smoking are "open and obvious." Hence, Defendants contend:

> The decision in *Ragsdale v. K-Mart Corp.* (1984), Ind.App., 468 N.E.2d 524 highlights the speciousness of plaintiffs' contention that only physically observable defects can be deemed "open and obvious". In that case, the court found that the dangers of a lawn mower blade were open and obvious even though the blade was concealed (and so not observable): "The fact that the mower blade is not clearly exposed to the user of the mower does not make it a hidden, and thus latent, danger. The ordinary user of a lawn mower is aware of the presence of a blade under the hood of the mower which moves to cut the grass." 468 N.E.2d at 527. See also, *Corbin v. Coleco Industries, Inc.* (1984), 7th Cir., 748 F.2d 411, 417 ("Whether a danger is open and obvious depends not just on what people can see with their eyes but also what they know and believe about what they see.")

Appellees' Brief at 24.

The "open and obvious" defense of *Bemis v. Rubish* (1981), Ind., 427 N.E.2d 1058 has no application to this case for two reasons. First, our supreme court recently held the rule does not apply to strict products liability claims. *Koske*, 551 N.E.2d at 442. Second, though the rule remains applicable to negligence theories of liability, *id.*, in our view, Defendants' cited authority defeats their argument. Both the *Ragsdale* and *Corbin* courts refer to physical qualities of a product which may be directly observed or deduced from observation. Neither case provides support for the proposition that knowledge of a product's characteristics which are not directly observable or deducible from observation may be considered in determining whether it poses an open and obvious danger. Nor are we aware of authority for that principle. Therefore, because there is nothing outwardly observable about a cigarette which would lead the user to conclude it is carcinogenic or addictive, summary judgment in favor of Defendants on the strict liability and negligence claims on the ground the dangers of cigarettes are open and obvious was inappropriate.

## D. § 402A Concept of "Unreasonably Dangerous"

■ Defendants next argue summary judgment was appropriate on the strict liability failure to warn and design defect claims because, as a matter of law, cigarettes are not "unreasonably dangerous" simply because cigarettes may be addictive.

An allegation that a product is "unreasonably dangerous" is an allegation that the use of a product exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by

the ordinary consumer who purchased it with the ordinary knowledge about the product's characteristics common to the community of consumers.

IC 33–1–1.5–2 (1988).

Moreover,

> [o]ne who sells, leases or otherwise puts into the stream of commerce any product *in a defective condition unreasonably dangerous* to any user or consumer or to his property is subject to liability for physical harm caused by that product to the user or consumer....

IC 33–1–1.5–3 (1988).

This language mirrors in relevant part the rule of strict liability defined in Section 402A of the Restatement (Second) of Torts. Comment *c* to Section 402A explains the rationale of strict liability theory:

> On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of *accidental* injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

Restatement (Second) of Torts § 402A, comment *c* (emphasis added).

 Accordingly, comment *i* explains the rule results in liability when the alleged defect makes the product unreasonably dangerous to the consumer—that is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." The comment illustrates with the example that "[g]ood tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous." [7]

The reference in comment *i* to tobacco to illustrate the operation of the "consumer expectations" principle, does not as a matter of law remove all claims of defective tobacco products from the operation of § 402A. Comment *i* instead instructs a product is not unreasonably dangerous if it injures in a way which, by objective measure, is known to the community of persons consuming the product. See *Koske*, 551 N.E.2d at 440–41. This comports with the "accident insurance" rationale of strict liability theory; injury resulting from the realization of risk the "ordinary" consumer calculated in his or her decision to use the product is not accidental.[8]

**7.** Yvonne seeks to distinguish her individual and representative claims by asserting the cigarettes to which Richard claimed he became addicted were unreasonably dangerous not because they were harmful but because the harmful qualities were accompanied by addictive qualities.

**8.** Defendants urge us to require a pleading of adulterated tobacco to satisfy the defect allegation required for plaintiff's prima facie case. Comment *i* states tobacco may be defective and unreasonably dangerous if adulterated. However, raw tobacco is not a manufactured product. It would have been inappropriate for the commentators to use the terms "mismanufactured tobacco" or "defectively designed tobacco" in the context of the illustration. Once again the point is there must be something irregular about the commodity or manufactured product in order for it to be deemed defective. Cigarettes, though they contain tobacco, are manufactured products. As such they are subject to design, packaging, and manufacturing variations which may indeed render them defective though the tobacco they contain is unadulterated. Failing to warn the consumer of certain properties, such as nicotine addiction, in conjunction with its harmful qualities, render the product unreasonably dangerous, *i.e.* in a condition the ordinary consumer would not contemplate. Also, a design defect which renders the product more addictive than it could be or addictive when it need not be at all may render the cigarette unreasonably dangerous in conjunction with its harmful qualities. Defects

■ Defendants argue the "health risks" of smoking are well within the contemplation of the ordinary consumer possessing ordinary knowledge common to the community as to the characteristics of cigarettes and that the "habituating propensities of smoking have long been common knowledge." Appellee's Brief at 20. However, Yvonne draws a distinction between the addictive, as opposed to habituating, qualities of cigarettes. There is no basis for our judicially noticing what the ordinary consumer's knowledge concerning the addictive qualities of cigarettes may have been when Richard began smoking in 1940. The state of knowledge attributable to the community of individuals consuming cigarettes has changed over time and will continue to do so. It was not until 1988 that the Surgeon General published a report informing of the addictive nature of cigarettes.[9]

Richard's admissions concerning his subjective awareness in 1960 that cigarettes were something he "couldn't get off of" and his subjective knowledge when he was very young that cigarettes "affected breathing," "stunted growth," or caused "hacking fits" is not determinative of what the average consumer of cigarettes knew about their addictive qualities. Thus the admissions do not serve to negate the strict liability claims. Neither is Richard's subjective knowledge determinative of the question whether the products were unreasonably dangerous. However, the admissions are relevant to both issues and further, may be relevant to the defense of whether Richard's continued use of the products was reasonable in light of his subjective knowledge. *See* IC 33–1–1.5–4(b)(1) (1988).[10]

Defendants argue the holding of *Roysdon v. R.J. Reynolds Tobacco Co.* (1988), 6th Cir., 849 F.2d 230 provides support for their assertion common knowledge of any product-connected danger imputes to the users knowledge of all dangers. The reasoning of *Roysdon* does not support such a broad proposition. The specific claim in *Roysdon* was that the cigarette manufacturer failed to warn of the increased risk of vascular disease resulting from the consumption of cigarettes. The court was prevented by a Tennessee statute from considering the viability of the plaintiff's claims relating to his consumption of cigarettes any farther back than ten years prior to the initiation of his suit. The court concluded that in light of the more serious risks of cancer and death associated with smoking known to the general public in that time frame, the plaintiff could not claim that the product was unreasonably dangerous because he did not have knowledge of his specific injury. *See Roysdon* at 232, 236.

*Garrison v. Heublein, Inc.* (1982), 7th Cir., 673 F.2d 189 is not inconsistent with *Roysdon* and is similarly distinguishable. All of the harms plaintiff claimed he allegedly suffered as a result of a liquor manufacturer's failure to warn over the course of his twenty-year period of alcohol consumption were judicially noticed by the court to be matters within common knowledge. As for cigarettes, the record is devoid of any evidence as to the state of the common knowledge of the consumer as to the addictive qualities of cigarettes at the time Richard began smoking.

■ In their factual contexts, we agree with the conclusions reached in *Roys-*

such as the foregoing satisfy the element that "something be wrong" with the cigarette.

9. U.S. Dep't. of Health and Human Services, *Health Consequences of Smoking, Nicotine Addiction: A Report of the Surgeon General* (1988).

10. Richard's knowledge also may be relevant to the element of causation. However, we note the trial court could not have granted summary judgment on the ground the Defendants' failure to warn of the addictive properties of their cigarettes was a contributing cause of Richard's injury. Defendants did not negate the existence

of issues concerning whether Rogers's admission that cigarettes were "more than just habit forming" evidenced his knowledge he suffered from a clinical condition, i.e., addiction, and whether a warning which adequately conveyed that fact to him would have altered his conduct as far as the type of treatment he might have sought to overcome the addiction. Also, Richard's use of the term "addiction" to describe his compulsion to smoke cigarettes merely raises a factual issue concerning whether he was aware of the clinical implications of his condition.

*don* and *Garrison.* However, there is not a state of common knowledge about cigarettes being "addictive" of which we are aware and, therefore, may judicially notice. Further, even the assumption consumer knowledge of any health risk associated with cigarettes imputes knowledge to the users of all health risks does not avail the Defendants. Consumer knowledge of all health risks associated with cigarettes is not a sufficient defense under IC 33–1–1.5–4(b)(1). The consumer's use of the cigarette must also be unreasonable. Knowledge of the addictive qualities of cigarettes is relevant to the issue of the unreasonableness of their use. We cannot state, as a matter of law, that knowledge of health risks associated with cigarettes overshadows knowledge of the risk of developing an addiction to cigarettes which, if medically unchecked, will result in the consumer's involuntary progression toward debilitating disease and probable death. Instead, it is a question of fact whether a consumer who chooses to use cigarettes without knowledge of the risk of addiction to the cigarettes, which would prevent him from discontinuing use of the cigarettes and incurring the associated health risks, does so unreasonably.

In summary, a question of fact exists concerning the state of consumer expectations with reference to the strict liability claim that Defendants failed to warn of the addictive qualities of their cigarettes prior to the January 1966 effective date of the Federal Cigarette Labeling and Advertising Act. A question of fact also remains concerning the allegations in the amended complaint that the products are defective because Defendants failed to expeditiously explore design alternatives which would make their products less addictive and whether that defect, if proven, rendered the products more dangerous than an ordinary consumer would contemplate.

## II. Fraud

■ The amended complaint ostensibly alleges claims for fraud, constructive fraud and fraudulent concealment, apparently based upon the Defendants' design, manufacture and distribution of cigarettes which are addictive. Count Four states in relevant part:

> Defendants by their persistent advertising, and/or their public pronouncements and comments criticizing the surgeon general's reports and the medical literature implicating tobacco as a cause of cancer and/or otherwise misrepresented material facts concerning the character and quality of their cigarettes. Richard Rogers justifiably relied upon such misrepresentations to his damage.

Record at 118.

Count Seven alleges in relevant part:

> While Richard Rogers was a user of Defendants' products, said Defendants failed to disclose to Richard Rogers material information which the Defendants knew or should have known.
>
> Such conduct by the Defendants constitutes a constructive fraud and/or fraudulent concealment.

Record at 123.

■ In light of the purpose declared in 15 U.S.C. § 1331 we hold the Federal Cigarette Labeling and Advertising Act also preempts Rogers's post–1965 intentional tort claims because the claims are based upon Defendants' actions with respect to the advertising and promotion of cigarettes. Thus we agree with the Third Circuit's pronouncement that the Act preempts "state law damage actions relating to smoking and health that challenge ... the propriety of a party's actions with respect to the advertising and promotion of cigarettes." *Cipollone,* 789 F.2d at 187. In addition, we conclude summary judgment in favor of Defendants on these counts was also appropriate because Ind. Trial Rule 9(B) requires that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be specifically averred." Here, the pleadings fail to allege fraud sufficiently—i.e. "the time, the place, the substance of the false representations, the facts misrepresented, and the identification of what was procured by fraud." *Dutton v. International Harvester Co.* (1987), Ind.App., 504 N.E.2d 313, 318 (citations omitted), *transfer denied.* The fraud counts simply fail to state a claim.

### III. Intentional Infliction of Emotional Distress

The amended complaint states Yvonne suffered psychic injury as a result of witnessing the injuries intentionally or willfully and wantonly inflicted upon Richard by Defendants' products. Assuming the allegations are true, the Indiana Supreme Court long ago held a person cannot recover for nervous shock due to witnessing an intentional willful and wanton injury to the person's spouse in the absence of physical injury to the person seeking to recover. *Boden v. Del–Mar Garage* (1933), 205 Ind. 59, 185 N.E. 860. *Boden* is but one of a long line of cases which assert and reaffirm Indiana's adherence to the rule that damages for emotional distress are recoverable only when accompanied by physical injury. *E.g., Charlie Stuart Oldsmobile, Inc. v. Smith* (1976), 171 Ind.App. 315, 357 N.E.2d 247, *vacated on issue of damages* (1977), 175 Ind.App. 1, 369 N.E.2d 947, *transfer denied,* and cases cited therein.

An exception to this rule applies if the emotional distress is occasioned by

certain tort actions involving the invasion of a legal right which by its very nature is likely to provoke an emotional disturbance. False imprisonment and assault actions are examples of instances in which a disagreeable emotional experience would normally be expected to be inextricably intertwined with the nature of the deliberate wrong committed, thereby lending credence to a claim for mental disturbance. The conduct of the defendant in such circumstances is characterized as being willful, callous, or malicious, which may produce a variety of reactions, such as fright, shock, humiliation, insult, vexation, inconvenience, worry, or apprehension.

171 Ind.App. at 327, 357 N.E.2d at 254 (citations omitted). This exception requires the tortious invasion of a legal right, i.e., the commission of a host tort. The host tort must be committed against, or directed to, the person who claims damages for the mental or emotional stress. Hence, in *Boden,* plaintiff wife alleged the defendant's servant "did, 'willfully and purposely … inflict injuries,'" by physically injuring plaintiff's husband in her presence. *Boden* at 60, 185 N.E. at 860. Wife, in addition to loss of consortium, claimed she was "terror-stricken and frightened, and thereby received great and permanent mental suffering and nervous shock to herself." *Boden* at 61, 185 N.E. at 860. The judgment of the trial court sustaining a demurrer to the complaint was affirmed, based in part upon the fact the tort committed was against the husband and not the plaintiff wife.

Thus the exception to the impact rule first requires a host action in the form of a tort directed to or committed against the claimant. Second, at the time the legal right is violated by the host tort, it must appear from either the type of tort or the means or manner by which the host tort is committed (e.g., willfully, callously or maliciously) that there is a likelihood emotional stress will follow.

The allegations implicitly reveal that Yvonne neither suffered a physical injury nor was the subject of a host tort directed at or committed against her. Thus, the amended complaint failed to state a cognizable claim and summary judgment was appropriately granted on it in favor of Defendants.

### IV. Punitive Damages

Summary judgment in favor of Defendants on the punitive damages aspect of the wrongful death claim is appropriate for the reason that punitive damages are not recoverable in wrongful death actions. *Andis v. Hawkins* (1986), Ind.App., 489 N.E.2d 78, *transfer denied.* However, summary judgment for the Defendants was inappropriate on Yvonne's individual claim for punitive damages. In Yvonne's individual action, she alleges she suffered the loss of Richard's consortium. The question of whether punitive damages may be recovered on a spouse's loss of consortium claim, as opposed to one made on behalf of a decedent's estate under the wrongful death statute, has never been

decided in Indiana.[11] We hold a claim for punitive damages may be appropriately asserted by Yvonne in her individual capacity under these facts.

The purpose of punitive damages is not to compensate or reward the plaintiff; it is to penalize a defendant. The issue is whether the defendant's conduct is so obdurate that it calls for an assessment of punitive damages. *See Carroll v. Statesman Ins. Co.* (1987), Ind., 509 N.E.2d 825, *Orkin Exterminating Co. v. Traina* (1986), Ind., 486 N.E.2d 1019. If Richard were alive to press his own personal injury claims, punitive damages would be available to him if he established Defendants' acts rose to the requisite level of culpability. His death precludes this outcome. It would be anomalous to allow Richard's death to insulate Defendants from liability for punitive damages when his widow claims them independently of the wrongful death statute.

Therefore, the trial court properly granted summary judgment on the wrongful death claim to the extent the judgment denies Richard's estate punitive damages. However, it erred in so doing to the extent it granted judgment on Yvonne's individual claim for punitive damages associated with her alleged loss of consortium.

## CONCLUSION

In summary, the trial court properly granted summary judgment on the strict liability claim for failing to warn of the addictive qualities of cigarettes on and after January 1, 1966. It also properly granted summary judgment on the numerous fraud claims, Yvonne's claims on behalf of the estate for punitive damages, and her individual claim for the wrongful infliction of emotional distress. However, the trial court erred in granting summary judgment on the strict liability claim for failing to warn of the addictive qualities of cigarettes before January 1, 1966; the strict liability and negligence claims for design defects; and Yvonne's individual claim for loss of consortium, including punitive damages in addition to compensatory damages.

The judgment is affirmed in part, reversed in part, and remanded for further proceedings in accordance with this opinion.

SULLIVAN and ROBERTSON, JJ., concur.

---

**11.** *See Board of Commissioners of Cass County v. Nevitt* (1983), Ind., 448 N.E.2d 333, 342 (claim for loss of consortium barred only when injured spouse's claim is invalid on the merits); *Warrick Hospital, Inc. v. Wallace* (1982), Ind.App., 435 N.E.2d 263, 269, (widow had individual action for loss of her husband's consortium between onset of his illness and death separate from that available under wrongful death statute), *overruled on other grounds, Community Hospital v. McKnight* (1986), Ind., 493 N.E.2d 775.