Dan R. CULLISON, Appellant–Plaintiff,

v.

Ernest W. MEDLEY, Doris Medley, Ron Medley, and Sandy Medley, Appellees–Defendants.

No. 84A01–9210–CV–342.

Court of Appeals of Indiana, First District.

Aug. 24, 1993.

Rehearing Denied Oct. 13, 1993.

Rudolph Wm. Savich, Bloomington, for appellant-plaintiff.

Kenneth E. Levin, Terre Haute, for appellees–defendants.

BAKER, Judge.

Plaintiff-appellant Dan R. Cullison appeals the trial court's judgment vacating a favorable jury verdict and ordering a new trial and also denying a change of judge motion. The issues we must address are whether the trial court abused its discretion in vacating the verdict and erred by denying the change of judge motion. Because our resolution of the abuse of discretion issue necessarily depends on the detailed nature of the underlying circumstances, which are rather peculiar, we deem it wisest to start at the beginning and work our way forward. Although not particularly difficult, the task is far from pleasant.

On February 2, 1986, Cullison, then thirty-four, encountered then sixteen-year old defendant-appellee Sandy Medley at an IGA parking lot in Linton, Indiana. Sandy was on an errand to pick up a container of Skoal chewing tobacco for her brother. After engaging her in conversation, Cullison learned Sandy had recently broken-up with her boyfriend. He eventually commented that Sandy had pretty lips and invited her to have a soft drink with him. Sandy told Cullison she didn't think her father would approve. She was right.

When Sandy's father, defendant-appellee Ernest Medley, heard Sandy's report, he strapped a .38 caliber handgun to his waist, threw on a coat, and gathered his wife, defendant-appellee Doris Medley, and his son, defendant-appellee Ron Medley. Together, he, Doris, Ron, and Sandy stormed over to Cullison's trailer. On the way, they stopped to pick up Terry Simmons, who was Sandy's brother-in-law and also Cullison's neighbor and relative.

The group reached Cullison's home and pounded on the door. Due to the late hour, Cullison thought there might be an emergency, so he rushed to the door without first dressing. Upon seeing there was no emergency, he withdrew to the bedroom to put his pants on. When he returned, he found that the Medleys and Simmons had entered the trailer and were standing in his living room. According to Cullison, Ernest flipped his coat open several times so as to reveal the handgun and demanded to know just exactly what he had meant by his remarks to Sandy.[1] When her turn came around, Sandy called Cullison "sick" and a "pervert" and, according to Cullison, "a bunch of stuff that I couldn't cope with hardly." Record at 221. Doris shouted "obscenities" and "filthy names." Record at 224. After about twenty minutes, Cullison experienced severe chest pains and feared he was suffering a heart attack. The Medleys left. On the way out, Ernest told Cullison, "[I]f you ever talk to my daughter again I'm gonna jump astraddle you and we're gonna put the word out on you." Record at 223. Cullison was petrified.

The Medleys found their visit with Cullison unsatisfying. According to Cullison, the Medleys missed few opportunities to express their continuing displeasure with him. For example, not long after the "jump astraddle" incident Cullison saw Ernest at a Hardees restaurant. Ernest again had a gun strapped to his waist. He glared at Cullison. Later, Cullison learned Ernest had previously shot a man in the back who had stolen some gasoline.[2] On

two separate occasions, Doris called Cullison a "bastard." Record at 332, 333. On another occasion, Sandy drove past Cullison and "flipped me off one night, give me the finger." Record at 330. On still another occasion, Sandy and Doris walked "back and forth" in front of Cullison's home while Ernest stood at the edge of his driveway. Record at 387.

As a result of these episodes, Cullison slept and ate little. When he did sleep, he had nightmares. He was depressed and anxious. He continued to suffer chest pains and panic attacks and was stricken with headaches. He was physically unable to work.

If by "putting the word out" on Cullison the Medleys meant spreading their perceptions of Cullison's behavior among their fellow townsfolk, the Medleys held true to their pledge. If Cullison is to be believed, it did not take long for many Linton residents, particularly high school-aged girls, to ostracize Cullison at every opportunity. If, on the other hand, the Medleys are to be believed, Cullison's ostracism occurred well before they ever said anything about him, his proclivities for the younger members of the community being as well-known as they were disliked.

Just how much of a pariah had Cullison become? On those occasions when Cullison could work, "it seems like just about every job I go on, I get confronted about being a pervert or a child molester." Record at 337. Two local fast-food restaurants told Cullison, "We don't want your kind in here." Record at 413. He was called "the town pervert." Record at 472. He testified, "I walk down the street, women run screaming from me. I've had that happen to me." Record at 336. The following passage sums it all up:

Q: Is it socially acceptable in Linton to call you a pervert?

A: That's what I hear, yes.

Record at 509.

The "jump astraddle" incident was bad enough. The threat of bodily harm fright-

---

1. Ernest later testified, "I didn't consider going out there without a gun." Record at 637.

2. Ernest later testified, "That was a mole hill made into a mountain." Record at 632.

ened Cullison badly and had affected him physically. Worse was the effect the Medleys' actions had on Cullison's relations with women. "Every time I got around [a female] I just, just kinda, kinda lost it I guess," Cullison explained. "I just, freeze up and I couldn't, couldn't even hardly talk to them. Nervous." *Record* at 235. Worst was his complaint that he had been rendered sexually impotent, unable to achieve an erection upon demand, as it were.

Cullison consulted a physician and was referred to a urologist. The urologist fitted Cullison with a device called a "snap gauge," designed to determine whether Cullison was having erections during his sleep.[3] Because Cullison was experiencing erections in his sleep, the urologist ruled out physical defects as the cause of Cullison's impotence. The urologist prescribed a "pep kit" with which Cullison could achieve an erection by injecting his penis with papaverine and phentolomene.[4] Cullison's urologist "personally showed [Cullison] how to inject himself ... with saline so he wouldn't cause any damage if he got it in the wrong place. And then he took those home, the syringes and that sort of thing, home and practiced, came back to my office ... and demonstrated ... that he was able to self-inject, without any problems[.]". *Record* at 454. According to Cullison, "about the only way you can compare it is just, like you pumped it full of air or something, and it lasts for quite a long time. Sometimes up to six hours." *Record* at 248.

Seeking recovery for his emotional and psychological injuries, Cullison filed suit against the Medleys alleged trespass, assault, harassment, and intentional infliction of emotional distress. The Medleys, who were convinced Cullison's claim was phony, successfully responded with a motion for summary judgment. On Cullison's appeal, this court affirmed the entry of summary judgment because as the law stood at the time, the "impact rule" generally prohibited recovery of emotional distress damages when the plaintiff suffered no physical injury. *Cullison v. Medley* (1990), Ind.App., 559 N.E.2d 619.

On transfer, the supreme court vacated our opinion, concluding that the historical rationale underlying the impact rule was "no longer valid[,]" and that the rule "does not apply to prohibit recovery for emotional distress when sustained in the course of tortious trespass." *Cullison v. Medley* (1991), Ind., 570 N.E.2d 27, 30. The supreme court also resuscitated Cullison's assault claim. With regard to Cullison's remaining allegations, the court held that under the circumstances, Cullison could not simultaneously maintain his action for invasion of privacy and trespass, and although "under the proper circumstances, liability will attach to a defendant for the intentional infliction of emotional distress, ... the facts in this case do not support a finding that the Medleys intended to cause emotional injury to Cullison." *Id.* at 31. The court remanded for trial on Cullison's trespass and assault claims, and affirmed the summary judgment on the invasion of privacy and intentional infliction of emotional distress claims.

Trial began on March 2, 1992. Cullison testified he had not experienced sexual relations since February 2, 1986, and that he was a wreck when in the company of women. Although they had no direct evidence disproving Cullison's allegation of impo-

3. The urologist testified:
[A] snap gauge is a device that has two velcro strips which are connected by three small bands or tapes. Each of those tapes is a little bit longer and, and a little bit um, um, more, a little uh, stronger than the, than the preceding smaller tape, so there are three of them. The snap gauge is applied by placing it around the mid portion of the penis just snug enough so that you stretch the first tape but you don't break it. Then you go to sleep and you, you evaluate the results of the snap gauge by finding out how many tapes were broken during the evening. If all of the tapes are broken, then the um, uh assumption is that the patient had a substantial erection which would allow enough change in the size of the penis to break all this tapes.
*Record* at 430–31.

4. A pep kit is a "pharmacological erection program kit which includes syringes, needles, and medication[.]" *Record* at 438.

tence, the Medleys offered considerable evidence that Cullison had continued to sexually harass numerous young women in Linton. For example, it came out that L.F., C.W., T.S., M.C., S.M., K.W., and T.G. all claimed Cullison had "bothered" them with inappropriate remarks and suggestions at one time or another since the original incident. *Record* at 414–15.[5] No one, however, claimed (or would admit) she had sex with Cullison since February 2, 1986.

During closing, one of Cullison's attorneys argued:

It's a recognized phenomenon. I'm just a, little guy and maybe not very appealing. I'm fifty years old. I wouldn't put a price on having sexual ability, that anybody could pay me, to take it away from me for whatever time I have left with it. But I'm only not gonna talk about the future for Dan Cullison but there has been six years. And I cannot imagine a reasonable man, from a man's standpoint, anyone thinking that ten thousand dollars per year is something that would be unreasonable compensation for that kind of injury. I wouldn't do it for that. I, I don't, it's a little embarrassing, I don't know how women view the same thing when they think about a man's sexual potence or impotence. But if it were ten thousand dollars per year it would be sixty thousand dollars. I cannot imagine that that's an unreasonable figure.

*Record* at 1213–14. The six-member jury awarded Cullison $60,000 in compensatory damages against Ernest, Doris, Ron, and Sandy. Outraged, it tacked on a $15,000 punitive damage award against Ernest and Doris.

The trial's result generated publicity in the local newspaper. A few days afterward, a businessman who knew nothing about the trial until reading about its result approached Ernest and told him that he too had heard about some goings-on between Cullison and several teenage girls at a particular restaurant. His was a version Ernest had not previously heard.

Ernest went to the restaurant and asked the manager if Cullison had been chasing girls there. The manager gave Ernest the names of three young women. Further investigation led Ernest to question one Jana Hardesty. Hardesty told Ernest that while she was a senior in high school, she had had intercourse with Cullison at least four times in the autumn of 1990, and that he performed without the use of the PEP kit. Hardesty was willing to put it in writing. At last, Ernest had the evidence he had sought for so long.

Relying primarily upon this newly discovered evidence, the Medleys filed a motion to correct error on April 6, 1992. A flurry of post-trial discovery followed. One deposition raised the name of Beth Slack, Hardesty's high school athletic coach. While Hardesty was in high school, she had confided in Slack that she was seeing an older man. Slack disapproved. One day while Hardesty and Slack ate in a restaurant, Cullison happened to appear. Hardesty pointed him out to Slack as being the man she had seen and told Slack she had had sex with him. Upon learning this corroborating information, the Medleys subpoenaed Slack.

Cullison was infuriated. He immediately filed a counter-affidavit denying he had sex with Hardesty. He told the trial court Ernest had gone around to young women like Hardesty and threatened them until they gave false evidence favorable to the Medleys' position. As proof of his representation, Cullison attached an affidavit from another Linton young woman, Susan Goodman. In that affidavit, Goodman averred:

1. My name is Susan Goodman. I work at Abrams and Hawkins Excavating Company, Inc. in Linton.

2. On or about May 28, 1992, [Ernest] Medley came to my place of employment. I had never met Mr. Medley before that day to the best of my recollection. Mr. Medley wanted me to be a witness against Dan Cullison. I only know Dan

---

**5.** According to Cullison, it was really the young women who were doing the harassing. He in-

sisted that "[o]n most everything they've said, they're lying[.]" *Record* at 474.

Cullison because he is a customer at Abrams and Hawkins and because he was a customer at Hardees in Linton when I used to work there. I do not know Dan Cullison socially except to exchange greetings if I see him out in public.

3. Mr. Medley told me that there is a tape recording which he could use to force me to testify against Dan Cullison but that he did not have a copy of the tape. Mr. Medley told me that he wanted me to testify that I had been to bed with Dan Cullison, which is not true.

4. Mr. Medley stayed at my place of employment for about an hour before he finally left. Later, I called Mr. Medley's attorney, James Riester, and told him that I would take action against Mr. Medley if he did not leave me alone.

5. I am making this affidavit on my own personal first hand knowledge.

I do hereby swear or affirm under the penalties provided for perjury that the foregoing allegations are true to the best of my knowledge and belief.

[Dated June 17, 1992]

/s/Susan Goodman

Susan Goodman

*Record* at 117. Goodman later gave a deposition in which she repeated her claims of Ernest's harassment. Cullison demanded the trial court limit the Medleys' presentation of evidence at the upcoming motion to correct error hearing.

The trial court sided with Cullison. Although the Medleys seemed to have discovered evidence that Cullison was not impotent after all, Susan Goodman's affidavit cast considerable doubt on the Medleys' new evidence. The trial court granted Cullison's motion to limit evidence and refused to allow the Medleys to present any testimony at the motion to correct error hearing. In the face of the conflicting evidence, the trial court exercised its discretion and chose to let the verdict stand. The Medleys timely filed a praecipe on July 29, 1992.

Within one week the Medleys were back in court, claiming they had evidence that Goodman's affidavit was false. They claimed it was Cullison, not Ernest, who actually had attempted to blackmail Goodman with the audio tape. On August 4, 1992, the Medleys filed a motion for a new trial based on Ind. Trial Rule 60(B). An amended T.R. 60(B) motion followed shortly thereafter. The source of this new information was Susan Goodman herself.

Intrigued, the trial court held the T.R. 60(B) hearing on October 13, 1992. At the hearing, Goodman testified that the affidavit she had given accusing Ernest of trying to persuade her to testify falsely against Cullison was itself largely false, as was her deposition testimony. Goodman's explanation of the circumstances surrounding the false affidavit follow.

After Ernest had visited Goodman at work on May 28, 1992, Cullison showed up and demanded to know what Ernest wanted. Cullison suggested to her that if she were to sign an affidavit, she would not have to go to court. If she refused to sign, Cullison would publicize an audio tape he had secretly made of a conversation he had had with her, but if she signed, he would destroy the tape.[6]

Goodman capitulated. Another of Cullison's attorneys called Goodman about preparing the affidavit and asked her several

6. The taped conversation occurred during the spring of 1991 when Goodman and a friend happened to meet Cullison in a park. Out of the friend's earshot, and with the tape recorder secretly running, Cullison asked Goodman if she and her friend would participate in a sexual threesome with him. Goodman rejected the offer immediately and soon told the friend what Cullison had proposed. As Goodman and the friend were leaving the park, Cullison remarked that if he couldn't have both of them, he wanted neither. After this incident, Goodman called Cullison and found him upset at her rejection of his proposal. To her dismay, Cullison replayed a portion of the tape over the phone.

The Medleys presented evidence at the T.R. 60(B) hearing that Cullison's secret taping was not novel. Charles Earle, a friend of Cullison's, testified that he had been present on an occasion at a restaurant when Cullison taped a conversation between one of Ernest's daughters and another woman without their knowledge. Earle also testified Cullison had once taped a phone conversation he had had with him.

questions. Goodman told the attorney that Ernest had visited her at work on May 28, 1992, and had asked her whether she had had a sexual relationship with Cullison. She also informed the attorney of the tape's existence. Cullison and his attorney prepared the affidavit and brought it to Goodman's place of employment for her to sign. She was again told that her signature "would take care of everything." *Record* at 1379. Despite the fact that she never told Cullison's attorney that Ernest had threatened to force her to testify or that Ernest had asked her to testify falsely that she had slept with Cullison, these two affirmations appeared in the affidavit. Because Goodman had customers to attend to, she looked over the affidavit hastily and signed it. After Goodman signed the affidavit, Cullison announced he would make good on his promise to destroy the tape. He later brought a tape over, and, without playing it, destroyed it in her presence. He then snidely commented on the meaninglessness of his act inasmuch as he could have made copies.

Goodman also recounted another episode at the T.R. 60(B) hearing. Prior to the hearing on the motion to correct error, the Medleys had subpoenaed her to give a deposition. Without her knowledge, Cullison retained an attorney, Brian Smith, to quash the subpoena and to obtain an order protecting her from Ernest. Again, the basis was Ernest's alleged harassment following the trial. At the T.R. 60(B) hearing, Goodman gave the following account:

> When [Smith] brought [the motion to quash paperwork] up to my office, that's when he told me there was a protective order, or a petition for a protective order. I asked him what for cause I hadn't, I hadn't told anybody about bringing it against him, a protective order. And he said, well, it, they just wanted to have it all done at the same time cause he was gonna go over to the court and file them, file the subpoena or to quash the subpoena.
>
> Court: Any you signed uh—
>
> Ms. Goodman: Yes I did.

Court: —now was this before the tape was destroyed was it?

Ms. Goodman: Yes.

Court: Or was it after?

Ms. Goodman: Well let me think. This was before.

Court: This was before.

Ms. Goodman: This was before.

Court: And you knew you were obtaining a protective order against Mr. Medley, that you were asking the Greene Circuit Court to protect you from Mr. Medley's harassment?

Ms. Goodman: Yes.

Court: And you went right ahead and did it? Why did you do that again?

Ms. Goodman: Because Dan Cullison had the tape.

Court: You were blackmailed. Is that what you're saying?

Ms. Goodman: Yes.

Court: So you committed perjury or you swore falsely in the affidavit because you were being blackmailed by Dan Cullison?

Ms. Goodman: Yes I did.

Court: And then you sought the protective order of another court falsely on a false petition because you were being blackmailed by Dan Cullison.

Ms. Goodman: Yeah.

Court: And now you're here today to tell it all straight.

Ms. Goodman: Yes.

       \*     \*     \*     \*     \*     \*

Court: Alright. Now all of this you're telling today is true?

Ms. Goodman: Yes.

Court: And everything you said in your affidavit is essentially false?

Ms. Goodman: Yes.

*Record* at 1384–87, 1389. It was now the trial court's turn to be outraged. When denying the Medleys' motion to correct errors, it had relied upon Goodman's affidavit in refusing to hear Jana Hardesty's testimony that Cullison was not impotent. Now Goodman herself had repudiated the basis for denying the motion to correct

error. But why hadn't Hardesty come forward before trial?

Hardesty was called to the stand, over Cullison's strenuous objection. She explained:

I gave Mr. Medley this affidavit because I knew nothing of the trial until it came out in the paper, that Mr. Cullison had received money because he claimed to be impotent because of an incident that supposedly Mr. Medley did. And I was read that in the paper by my parents. At the time they knew nothing about [her relationship with Cullison]. I was shocked. I couldn't believe it. I didn't know, I didn't not, not know if what I had to say would help, that it was too late, since I had had sex with him and, when Mr. Medley contacted me, I, he asked through a friend if I would talk to him. Nothing else was said. I said yes. He just asked if I would talk to him and I said yes. Because he was lying.

Q: Who was lying?

A: Dan Cullison.

*Record* at 1492. Following this testimony, Beth Slack confirmed that Hardesty had previously disclosed to her Hardesty's relationship with Cullison.[7]

On October 21, 1992, the trial court vacated Cullison's $75,000 judgment as follows:

### ORDER VACATING JUDGMENT

The Court now having fully considered the testimony and arguments of counsel at the Trial Rule 60(B) hearing, does now find that the Motion should be granted and a new trial ordered.

The Court has concluded that Susan Goodman swore falsely in her affidavit with respect to matters contained therein. That such affidavit was made under circumstances that suggest [Cullison] made representations to the witness regarding disclosure of a tape of a conversation with her and assured her if she gave an affidavit she would not have to testify.

The Court further finds that it relied upon the truthfulness of the affidavit in denying the Defendants' Motion to Correct Errors in that the affidavit suggested; when combined with the Protective Order Application by Goodman, that misconduct had involved a pattern of harassment by Defendant Ernest Medley.

The Court was also persuaded as to the probable credibility of a new witness Jana Hardesty by corroborating testimony of one of her school teachers. Further, that the new witnesses had a desire to conceal their evidence for the sake of their own privacy and could not have been discovered prior to trial by the Defendants.

This new evidence is material because it would, if believed, disprove Plaintiff Cullison's claim of emotional or psychological impotency.

IT IS THEREFORE ORDERED that the Judgment of March 6, 1992 is vacated and declared a nullity and that a new

---

7. In addition to Goodman's, Hardesty's, and Slack's testimony, the Medleys presented other evidence at the T.R. 60(B) hearing ultimately casting doubt on Cullison's testimony that the Medley's had rendered him impotent. As previously noted, Charles Earle testified that Cullison had secretly recorded conversation before. Two of Goodman's friends confirmed that Goodman had told them about Cullison's playing the recording over the phone. The proposed third member of the threesome confirmed Goodman had told her about Cullison's suggestion, and that she "told [Cullison] he was sick." *Record* at 1443. She also testified that she also heard Cullison remark that if he couldn't have both her and Goodman, he wanted neither. Nigel Lehman, Goodman's boss, testified that Goodman had admitted to him immediately after giving the deposition that she had lied out of fear of Cullison and his tape and that he counseled her to tell the truth. Wes Daniels, a roofer who had hired Cullison in July of 1987 to help with a job in Richmond, Indiana, testified that while he and Cullison shared a motel room in Richmond, he discovered Cullison masturbating a "full erection.... you can't miss it when you're, the bed's right in front of you." *Record* at 1323, 1337. Robert Whitlow, Sr. testified that in the summer of 1991 he had a conversation with Cullison in which Cullison mentioned that he was having a sexual relationship with a young woman who "was nineteen and uh, she couldn't get enough of him and uh, kept, keeping him pretty well wear, wore out...." *Record* at 1522.

trial is ordered and is set upon the calendar of the Court on August 2, 1993 at 9:00 a.m.

SO ORDERED this 21st day of October, 1992.

*Record* at 164. Cullison immediately moved for a change of judge, which was denied. Cullison appeals both the new trial order and the denial of his change of judge motion.

### DISCUSSION AND DECISION

#### I. New Trial

T.R. 60 lists eight reasons allowing a trial court, upon such terms as are just, to relieve a party from the entry of final judgment. The Medleys' motion primarily relied on subsections (2) and (3): newly discovered evidence and fraud, respectively.

■ The T.R. 60(B) movant bears the burden of establishing the existence of valid grounds for relief. *Taco Bell Corp. v. United Farm Bureau Mutual Insurance Co.* (1991), Ind.App., 567 N.E.2d 163, 165, *trans. denied.* In the case of newly discovered evidence, the movant "must establish that the evidence is material and relevant, that it is not cumulative, and that it will probably produce a different result." *Cua v. Ramos* (1982), Ind., 433 N.E.2d 745, 750. In the case of fraud or misrepresentation, the motion for relief must demonstrate that (1) the affiant knew or should have known from the available information that the representation made in the affidavit was false, and (2) the representation concerned a material fact which would alter the outcome. *Freels v. Winston* (1991), Ind.App., 579 N.E.2d 132, 135, *trans. denied.*

■ A motion made under subdivision (B) of T.R. 60 is addressed to the "equitable discretion" of the trial court; the grant or denial of the T.R. 60(B) motion "will be disturbed only when that discretion has been abused." *Fairfield v. Fairfield* (1989), Ind., 538 N.E.2d 948, 949–50. In making the decision, the trial court is required to "balance the alleged injustice suffered by the party moving for relief against the interests of the winning party and society in general in the finality of litigation." *Chelovich v. Ruff & Silvian Agency* (1990), Ind., 551 N.E.2d 890, 892. "Abuse of discretion will be found only when the trial court's action is clearly erroneous, that is, against the logic and effect of the facts before it and the inferences which may be drawn therefrom." *Fairfield, supra* at 950.

Cullison first contends the trial court should have neither entertained nor granted the Medleys' T.R. 60(B) motion because the "basic premise of the [T.R. 60(B)] motion was covered or could have been addressed in the unsuccessful motion to correct errors." *Appellant's Opening Brief* at 15. He seems to claim that once the trial court rejected Jana Hardesty's evidence at the hearing on the motion to correct error, the trial court was precluded from again considering it.

■ It is true that "[a]ny ... issue which was raised by, or could have been raised by a timely motion to correct errors and a timely direct appeal may not be the subject of a motion for relief from judgment under T.R. 60." *Snider v. Geddis* (1980), Ind.App., 413 N.E.2d 322, 326. This is because T.R. 60(B) is meant to afford relief from circumstances which could not have been discovered during the period a motion to correct error could have been filed; it is not meant to be used as a substitute for a direct appeal or to revive an expired attempt to appeal. *Id.* at 324. In essence, Cullison claims the Medleys had their chance with the motion to correct error, and, having lost that chance, should not have been afforded a second opportunity to present Hardesty's evidence.

Not only are we wholly unpersuaded, we are somewhat baffled with this line of argument. It was Cullison himself who successfully demanded the trial court prohibit the Medleys' several witnesses from testifying at the motion to correct error hearing. The trial court refused to hear the Medleys' evidence because Susan Goodman's affidavit suggested Ernest had manufactured Hardesty's claim through coercion and deceit. Unsurprisingly, perhaps,

Cullison ignores the fact that the trial court later found Susan Goodman's affidavit to be false; if Goodman is to be believed, it was Cullison, not the Medleys, who, in the trial court's words, "blackmailed" Goodman into perjuring herself. Not only does Cullison brazenly ask us to ignore the substance of Goodman's false affidavit, he also asks us to ignore the deceptive circumstances in which that affidavit seems to have been procured.

■ This is not a case in which a T.R. 60(B) movant has unjustifiably sought to rehash the same old allegations that were raised or could have been raised in the motion to correct error. Instead, this is a case where the T.R. 60(B) movant has demonstrated that the foundation upon which the motion to correct error was denied was itself flawed. Once the reason for denying the motion to correct error—here, Goodman's affidavit—ceased to exist, we see no reason why it would be an abuse of discretion for the trial court to consider the substance of the original motion to correct error—here, Hardesty's testimony—in the T.R. 60(B) context. We remind Cullison that the trial court exercised its *equitable* discretion, "a privilege accorded a judge within the confines of justice to act in accordance with what is fair and equitable." *Snider, supra,* at 328 (Robertson, J., dissenting).

■ The Medleys met their burden of establishing their newly discovered evidence was material and relevant, not cumulative, and likely to produce a different result. Evidence is "material" if it may be dispositive of the litigation or a relevant secondary issue. *Willsey v. Peoples Federal Savings & Loan* (1988), Ind.App., 529 N.E.2d 1199, 1206 n. 5. "Relevant" evidence is evidence which tends logically to prove or disprove a material issue of fact. *Hansford v. State* (1986), Ind., 490 N.E.2d 1083, 1089. Hardesty's evidence was both

of these. "Cumulative evidence" is that "which tends to prove that which has already been established." *Newell v. Walker* (1985), Ind.App., 478 N.E.2d 1246, 1250. Hardesty's evidence obviously had not been previously established. Similarly, Beth Slack's testimony was not cumulative because the probable truth of Hardesty's testimony had not been firmly established in the trial court's mind until Slack's testimony corroborated Hardesty's revelation. Finally, Hardesty's evidence, if believed, is likely to produce a different result; if it is true that Cullison was not impotent, a substantial, if not entire, portion of his damage claim will necessarily fail. Although it is true that "the general rule [is] that newly discovered evidence going to the sole question of damages cannot ordinarily be made the basis for granting a new trial[,]" *Kavanagh v. Butorac* (1966), 140 Ind.App. 139, 151, 221 N.E.2d 824, 831, the new evidence in this case cannot fairly be said to go solely to the question of damages. If Hardesty's version is true, Cullison's is false, and the whole of his claim is jeopardized. We hold the trial court did not abuse its equitable discretion in vacating the jury award, punitive damages and all, and awarding a new trial on the basis of Jana Hardesty's newly discovered evidence.

Given our conclusion, it is unnecessary to address Cullison's claim that the trial court erred by awarding a new trial on the basis of fraud or misrepresentation occurring after the trial. One valid reason is enough. *See Newell, supra.* In passing, we would observe that Cullison's arguments concerning the circumstances surrounding the Goodman affidavit miss the point. It was Jana Hardesty's testimony, not Cullison's attorneys' misconduct, that ultimately warranted a new trial.[8] The trial court specifically found Hardesty was credible and that her evidence, if believed, would disprove Cullison's claim of emotional and psycho-

---

8. Although Cullison's attorneys' alleged misconduct may not have warranted a new trial, their conduct, if shown to be as Goodman alleged, will certainly warrant a trip to the disciplinary commission. Because the facts surrounding the Goodman affidavit are so hotly disputed, however, we feel referral to the disciplinary com-

mission would be premature at this time. Instead, we pass this task to the trial court with instructions to evaluate the truthfulness of Goodman's position; if it is convinced such action is warranted, the trial court should not hesitate to inform the disciplinary commission of its suspicions.

logical impotency. Although Goodman's testimony at the T.R. 60(B) hearing may have persuaded the trial court to consider the merits of Jana Hardesty's claim, plainly it was the latter, and not the former, that served as the basis for relief. The trial court's decision to vacate the judgment and order a new trial is affirmed.

## II. Change of Judge

 Cullison also appeals the denial of his change of judge motion. When a new trial is granted, a party is entitled to one change of judge if a timely request is made. Ind. Trial Rule 76(B) and (C)(3).[9] Because Cullison's motion for change of judge was timely, the trial court erred in denying the motion. We reverse the denial of the change of judge motion and remand for further proceedings accordingly.

Affirmed in part, reversed in part, and remanded.

ROBERTSON and GARRARD, JJ., concur.

Stephen Bower, Cohen and Thiros, Merrillville, for appellant-defendant.

Pamela Carter, Atty. Gen., Suzann Weber Lupton, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

---

**9.** We acknowledge that Ind. Trial Rule 60(C) states: "No change of venue in such cases shall be taken from the judge or county except for cause shown by affidavit." We do not interpret T.R. 60(C) as precluding a change of judge after a ruling on the T.R. 60(C) motion. Instead, T.R. 60(C) prohibits a change of judge to preside at the T.R. 60 hearing unless cause is shown by affidavit.