Yvonne ROGERS, Individually and as Executrix of the Estate of Richard Rogers, Deceased, Appellant–Plaintiff,

v.

R.J. REYNOLDS TOBACCO CO., Philip Morris Incorporated, the American Tobacco Co., Inc., and Liggett Group, Inc., Appellees–Defendants.

No. 49A02–9808–CV–668.

Court of Appeals of Indiana.

June 30, 2000.

Rehearing Denied Aug. 30, 2000.

C. Warren Holland, Michael W. Holland, Holland & Holland, Morris L. Klapper, Klapper Isaac & Parish, Indianapolis, Indiana, Attorneys for Appellant.

Richard D. Wagner, Thomas J. Costakis, Jeffrey C. McDermott, Krieg DeVault, Alexander & Capehart, Indianapolis, Indiana, William T. Plesec, Paul D. Koethe, Kevin D. Boyce, Jones, Day, Revis & Pogue, Cleveland, Ohio, James W. Riley, Jr., Riley Bennett & Egloff, Indianapolis, Indiana, Aaron H. Marks, Kasowitz, Benson, Torres & Friedman LLP, New York, NY, Attorneys for Appellees.

## OPINION

RILEY, Judge

### STATEMENT OF THE CASE [1]

Plaintiff–Appellant Yvonne Rogers (Yvonne), individually and as Executrix of the Estate of her late husband, Richard Rogers (Richard), appeals an adverse jury verdict on the strict liability and wrongful death claims against cigarette manufacturers and distributors; R.J. Reynolds Tobacco Company, Philip Morris Incorporated, The American Tobacco Company, and Liggett Group, Incorporated (hereinafter referred to collectively as "Defendants").

We affirm in part, reverse in part, and remand for further proceedings in accordance with this opinion.

### ISSUES

Rogers raises several issues for our review, which we consolidate and restate as follows:

1. Whether the trial court judge erred in failing to notify the parties that he advised the jury, at the jury's request during deliberations, that it could hold a press conference following the reading of the verdict.

2. Whether the trial court erred in denying Rogers' Motion for Relief from Judgment under Ind.Trial Rule 60(B) based on newly discovered evidence.

3. Whether the trial court erred in instructing the jury on the defense of incurred risk and on the meaning of "defective product."

4. Whether the trial court erred in the exclusion of certain evidence.

---

1. We heard oral argument on February 24, 2000 in the Lilly Library at Wabash College in Crawfordsville, Indiana. We would like to thank Wabash College for its hospitality.

5. Whether the trial court erred by denying Rogers' Motion to Amend her Complaint to include a claim that the Defendants were engaged in an abnormally dangerous activity.

*FACTS AND PROCEDURAL HISTORY*

We adopt the facts of *Rogers v. R.J. Reynolds Tobacco Co.*, 557 N.E.2d 1045 (Ind.Ct.App.1990), *reh'g denied*, as previously determined:

The evidence before the trial court at the summary judgment hearing was as follows: Richard Rogers, Yvonne's deceased husband, was born in 1935. He began smoking discarded cigarette butts when he was five or six years old. As a child he was prompted to smoke by seeing his father, his parents' friends, and movie heroes smoking. He also was aware of athletes promoting the use of cigarettes in advertisements. By the age of five he had heard smoking "stunts your growth." Record at 673. His high school coaches warned smoking affected breathing. Richard's father quit smoking when Richard was fifteen. His father told him he quit because he had experienced a "bad hacking fit." Record at 360.

By the sixth grade, Richard was smoking close to a pack of cigarettes a day. At the time he graduated from high school in 1953 and during the two years he was in the army, Richard smoked two packs of cigarettes a day. When he reached his mid-twenties he was smoking about three packs a day. He continued to smoke between two and three packs of cigarettes a day until June 24, 1986, when he was able to quit after receiving a short course of medical treatment consisting of hypnosis and drug therapy. Two months later Richard was diagnosed as having lung cancer.

As early as high school Richard smoked not for pleasure, but because it was a habit he could not break. By the age of twenty-one, he knew heavy smoking posed a greater health risk than moderate smoking. In 1960, when he made his first conscientious but unsuccessful attempts to quit smoking, he realized cigarettes were "more than just habit forming"; they were something he could not "get off of." Record at 671. Starting in 1970, Richard resorted several times to staying in bed all weekend as a method of quitting smoking.

[W]hat I was trying to do was take myself out of a situation where I did anything where I smoked. If I slept I didn't smoke. If I was in bed I didn't smoke. So the idea was get in bed, do nothing that would prompt you to get a cigarette. If I'd get up, I'd get a cup of coffee and light a cigarette; if I ate, I'd light a cigarette; get a newspaper, I'd light a cigarette. Everything I did was with a cigarette. So what I was hoping to do was immobilize myself for those three days. The idea was if you could go a week, maybe you could make it. I could never get that far. Record at 720.

This method proved unsuccessful for Richard; the first place he would go on the following Monday morning was to a drugstore. In his words, "I had to have that cigarette." Record at 567.

Sometime between 1960 and 1978, Richard attended a meeting sponsored by the American Cancer Society. He described the experience and his reaction to it.

A. ... [I]t was kind of like an Alcoholics Anonymous format where you'd be teamed up with somebody that you could call if you wanted to get some help, one of those things. Record at 677.

Q. .... Why was it that you determined that the program that they offered was not for you?

A. Because I have great willpower [sic]. I can quit smoking any time I want to. That was my thought. But I couldn't. Record at 682.

In 1964 Richard learned of the link between cigarette smoking and cancer from the widely-disseminated conclusion of the Surgeon General's report on Smoking and Health.

[T]he surgeon general was saying there was a risk of cancer, and that from the first warning, his warnings kept getting stronger and stronger. And the doctors were starting to tell you, don't smoke. Publications were telling you, don't smoke. Newspaper articles were telling you what the surgeon general was saying. He was appearing on television. Hospitals and doctors and clinics were appearing on television saying there was a danger. Record at 487–88.

I recall the initial warning coming out saying that they have discovered that cancer was caused by smoking.... Record at 489.

I think the first word was there was a link between cigarette smoking and cancer.

. . . .

This is not just TV reports. I mean, it's blasted. When something like that comes out, it's TV, newspapers, people by word of mouth talking about it. It's a widely discussed subject. We're not talking about one isolated newspaper. We're talking about a social concept. Record at 490–91.

Finally, Richard acknowledged the cigarettes he had purchased since the January 1, 1966 effective date of the Federal Cigarette Labeling and Advertising Act bore the required warning labels.

Richard and Yvonne filed their initial complaint on March 7, 1987. Richard died on October 2, 1987. The complaint was subsequently amended to state a wrongful death claim based on the theories of strict liability, negligence and fraud. In her individual capacity, Yvonne sought damages for loss of Richard's consortium prior to his death and for the intentional infliction of emotional injury. Finally, the amended complaint contained allegations of both intentional and wanton and willful misconduct as a basis for punitive damages. The trial court granted summary judgment against Yvonne individually and as personal representative on all counts.

*Rogers v. R.J. Reynolds Tobacco Co.*, 557 N.E.2d 1045, 1047–1049 (Ind.Ct.App.1990).

In that decision, we concluded that:

the trial court properly granted summary judgment on the strict liability claim for failing to warn of the addictive qualities of cigarettes on and after January 1, 1966. It also properly granted summary judgment on the numerous fraud claims, Yvonne's claims on behalf of the estate for punitive damages, and her individual claim for the wrongful infliction of emotional distress. However, the trial court erred in granting summary judgment on the strict liability claim for failing to warn of the addictive qualities of cigarettes before January 1, 1966; the strict liability and negligence claims for design defects; and Yvonne's individual claim for loss of consortium, including punitive damages in addition to compensatory damages.

*Id.* at 1057. Thus, we affirmed the trial court's judgment in part, reversed in part, and remanded for further proceedings in accordance with that opinion.

Subsequently, on December 2, 1993, Rogers moved for partial summary judgment on the issues of whether the distribution of cigarettes is an abnormally dangerous activity and whether Richard Rogers voluntarily incurred the risk of smoking cigarettes. On April 26, 1994, the trial court denied Rogers' motion on the grounds that there were genuine issues of material fact.

On November 4, 1994, Rogers filed her Motion for Leave to File a Second Amended Complaint for Damages to add the theory that Defendants distribution of cigarettes was an abnormally dangerous

activity. On December 1, 1994, the trial court denied Rogers' motion to amend.

The trial commenced on January 31, 1995. On February 23, 1995, after two days of deliberations, the court declared a mistrial when the jury advised the court that it was hopelessly deadlocked. The retrial commenced on August 5, 1996. Before reading the verdict, the trial judge announced that the court had granted the jury's request to hold a press conference in the courtroom and to make a public statement after the reading of the verdict. On August 23, 1996, the court entered judgment on the jury verdict, finding for Defendants. Rogers now appeals.

## DISCUSSION AND DECISION

### I. *Jury Press Conference*

First, Rogers argues that the trial court judge abused his discretion by failing to notify the parties that he advised the jury, at the jury's request during deliberations, that it could hold a press conference following the reading of the verdict. Specifically, Rogers contends that there is a reasonable inference that the jury's opportunity to hold a press conference was a subject discussed during deliberations, and the jury's understanding that it would have the ability to explain its verdict in a press conference presented a risk that jury deliberations were influenced. Essentially, Rogers claims that the jury verdict was compromised as evidenced by the press conference statements reported in the *Wall Street Journal*.

The Record reveals that on Friday, August 23, 1996, during the second day of deliberations, the jury bailiff was summoned to the jury room to respond to a personal request of one of the jurors. A juror asked the bailiff if the trial judge would permit the jury to conduct a news conference after it returned the verdict. The jury bailiff verbally relayed the jury's request to the judge and the bailiff returned to the jury room and verbally indicated the judge's response in a single word, "yes". The jury deliberated for another seven hours and reached a verdict. On August 23, 1996, before the jury verdict was read, but after the jury foreperson had handed the judge the verdict, the trial judge announced that the jury had requested permission to conduct a press conference after delivery of the verdict and that he was permitting it to do so in the courtroom.

On September 20, 1996, Rogers filed a Motion for Trial Court to Supplement Record for Purposes of Appeal to provide information about the court's communication with the jury during deliberation. In support of this motion, Rogers attached an affidavit of C. Warren Holland, an attorney who represented Rogers at trial. In the affidavit, Holland states that he had no knowledge or information concerning the jury's question concerning a press conference and the court's affirmative response to the jury's request until the court's announcement before the verdict. Rogers also attached as an exhibit to the motion, the *Wall Street Journal* article that contained a report of the jury's statements made at the press conference, including: " 'concern that our verdict may be misconstrued as an endorsement of the tobacco companies' position on smoking and health . . . . [and] we felt the evidence did show a degree of negligence on the part of the cigarette companies.' " (R. 2517). The article continued to explain "[t]he jurors disclosed that they believed cigarette makers had been negligent in the case and that under somewhat different circumstances, they would have ruled for the plaintiff." *Id.* However, under Indiana's law of comparative fault, Defendants' negligence must have been greater than fifty percent in order for Rogers to have prevailed. *Id.*

On October 29, 1996, the court rendered its entry supplementing the record for appeal, stating that:

[t]he jury's verbal request for a news conference after they returned their verdict and my one word reply of 'yes' did

occur during the course of the jury's deliberations and was not communicated to counsel because, in my opinion, it was not remotely material to their deliberations and I was concerned with being able to provide them security as they left an already overcrowded courtroom.

(R. 2523).

 In circumstances of ex parte communications between the trial judge and the jury, the preferred method of communicating with the jury is on the record in open court. *Smith v. Convenience Store Distributing Co.*, 583 N.E.2d 735, 738 (Ind.1992). When jurors request additional guidance from the court, the proper procedure is for the judge to notify the parties so that they may be present in court before the judge communicates with the jury. *Id.* at 737; *Martin v. State*, 535 N.E.2d 493 (Ind.1989); *Averhart v. State*, 470 N.E.2d 666 (Ind.1984). An inference of prejudice arises from an ex parte communication and this inference creates a rebuttable presumption that error has been committed. *Martin*, 535 N.E.2d at 497. However, if an explanation for the communication is given, and we are satisfied that no harm resulted, then the judgment will be allowed to stand. *Smith*, 583 N.E.2d at 738. Additionally, when the trial judge merely responds to a jury question by denying the request, any inference of prejudice is rebutted and any error is deemed harmless. *Moffatt v. State*, 542 N.E.2d 971, 974 (Ind.1989); *Martin*, 535 N.E.2d at 497. Further, this Court has held that the harmless error rule applies to a trial court's ex parte denial of jury requests, regardless of whether counsel is present or not. *Johnson v. State*, 674 N.E.2d 180, 183 (Ind.Ct.App.1996). Finally, in determining whether the presumption of harm has been rebutted, we evaluate the nature of the communication to the jury and the effect it might have had upon a fair determination. *Smith*, 583 N.E.2d at 738; *Marsillett v. State*, 495 N.E.2d 699, 709 (Ind.1986).

Ind.Code § 34–36–1–6 further delineates the procedure to be followed when the jury requests additional information after retiring to deliberate:

If, after the jury retires for deliberation:

(1) there is a **disagreement** among the jurors as to any part of the testimony; or

(2) the jury desires to be **informed** as to any **point of law** arising in the case; the jury may request the officer to conduct them **into court**, where the information required shall be given **in the presence of**, or after notice to, the parties or the attorneys representing the parties.

Ind.Code § 34–36–1–6 (emphasis supplied) (formerly Ind.Code § 34–1–21–6).

 This statute has been construed to require the judge, where the jury expresses disagreement regarding testimony, to read to the jury any properly admitted testimony or documentary evidence. *Kiner v. State*, 643 N.E.2d 950, 955 (Ind.Ct. App.1994). Further, the judge is also to respond to a jury's request that seeks clarification on legal issues. *Id.* However, the statute has not been construed to mean that failure to so inform the jury is reversible error per se. *Id.* Thus, the trial court must exercise discretion in determining whether certain questions of the jury should be answered. *Id.*

In *Smith v. Convenience Store Distributing Co.*, 583 N.E.2d 735, our supreme court found reversible error because the trial judge spoke to the jury during deliberations about information that was not within the purview of what the parties' attorneys had permitted the judge to speak to the jury about outside their presence. The parties' attorneys had given the judge permission to speak to the jury to determine (1) whether the jury wanted to retire for the evening and return the next morning to continue deliberations, and (2) the numerical split among the jurors, without reference to in whose favor the jury was split. *Smith*, 583 N.E.2d at 737.

However, during the discussion, one of the jurors asked what would happen if the jury remained deadlocked. *Id.* The judge indicated that the parties had unsuccessfully mediated the case, that he did not believe the case would be settled, and if the jury was hung, the case would probably have to be retried. *Id.*

In that case, our supreme court noted that the process of jury deliberation is a sensitive point in the trial, and explained that:

> Deliberation is the process by which the jury resolves the dispute before it on the basis of the evidence and instructions given in open court. Deliberations are to be free of extraneous influence so this purpose can be fulfilled. When this process is interrupted by an *ex parte* communication, the presumption is that the jury is influenced.

*Smith,* 583 N.E.2d at 738. The Court further reasoned that:

> Given that the question was posed by the juror in the first place, we do not accept that the effect of a failure to render a verdict was so apparent to the jury. Additionally, the information provided by the judge was not necessarily accurate because the parties may well have negotiated a settlement rather than incur the costs associated with a second trial. Finally, it is reasonably possible that advice from the judge that another jury will have to hear the same evidence in a new trial may have induced the jury members to prove themselves capable of resolving the controversy rather than forfeiting the opportunity to another group.

*Id.* Furthermore, because approximately ten minutes after the judge spoke to the jury, the jury returned a verdict, our supreme court found that the presumption of error was further supported by the short time interval between the judge's comments and the verdict, because the sudden turn of events was evidence that the judge's comments had influenced the jury's verdict. *Id.*

■ However, the case at hand is quite different from present Indiana case law regarding ex parte communication between a trial judge and the jury. In our case, neither party's counsel was present when the trial judge responded to the jury's request. Also, the jury did not request additional guidance, was not in disagreement as to any part of the testimony, and did not desire to be informed as to any point of law arising in the case. Furthermore, after the trial judge gave his one word affirmative response to the jury's request to hold a press conference, the jury deliberated for an additional seven hours before returning a verdict.

Nevertheless, as we previously stated, an inference of prejudice arises from an ex parte communication and this inference creates a rebuttable presumption that error has been committed, *Martin,* 535 N.E.2d at 497, but, if an explanation for the communication is given, and we are satisfied that no harm resulted, then the judgment will be allowed to stand. *Smith,* 583 N.E.2d at 738. In this case, the trial court judge did give an explanation for his ex parte communication with the jury, however, we are not satisfied that no harm resulted.

■ Allowing the jury to hold a press conference is an invitation for controversy, because a press conference gives the jury the opportunity to explain its verdict, thereby inviting the parties to challenge the verdict based on what the jury said at the press conference. However, Indiana adheres to the common law rule that a verdict may not be impeached by evidence from the jurors who returned it. *Dawson v. Hummer,* 649 N.E.2d 653, 664 (Ind.Ct. App.1995). Therefore, although we recognize that jurors are free to discuss their deliberations post verdict, a press conference may create a situation where a jury makes a statement after it has returned its verdict, indicating improprieties in arriving at its verdict, but no remedy exists to cure the improprieties because a jury's verdict

cannot be impeached by what it said at the press conference.

Furthermore, in order to evaluate the harm or prejudice to Rogers of the judge's ex parte communication outside the presence of both parties, we can only evaluate what the jury stated at the press conference. However, any statements made at the press conference as reported by the *Wall Street Journal,* amount to hearsay, and also, the jury's verdict cannot be impeached by what was said at the press conference. Therefore, because an inference of prejudice arises from an ex parte communication, and because we can only evaluate the harm or prejudice that resulted from the ex parte communication by evaluating what the jury said at the press conference, which we cannot do, there is no evidence available to rebut the presumption that error has been committed.

Additionally, the jury's request to hold a press conference does not amount to a housekeeping request. Instead, the request had a direct effect on the deliberations because we must assume that the jury's request to hold a press conference was motivated by a desire to explain its method in arriving at its verdict, and therefore, the statements to be made at the press conference were in all likelihood discussed during deliberations. As such, the jury's request was one the judge should have raised on the record in open court with the presence of both parties' counsel, prior to responding to the jury's request. After consultation with the parties, the trial judge could have responded "yes", "no", "I will not answer that question until after you have reached a verdict", or some other response with an admonition that his decision as to whether the jury could hold a press conference should play no part in its deliberations. The fact that the trial judge granted the jury's request to hold a press conference after it reached a verdict, during deliberations, without informing either party as to his decision, further undermines public confidence in the jury's verdict. In this case, although the jury deliberated for another seven hours after receiving permission to hold a press conference, the jury had the opportunity to discuss during deliberations what it would say at the press conference, thereby affecting the outcome of the verdict. Specifically, if a particular juror was uneasy about rendering a verdict in favor of the tobacco company Defendants, the opportunity to hold a press conference following the reading of the verdict may have cured this uneasiness by allowing this juror to explain his or her decision to the public.

Therefore, we find that the judge's ex parte communication with the jury is reversible error because the presumption of error regarding ex parte communication cannot be rebutted without considering what the jury said at the press conference. This we cannot and will not do.

## II. *Newly Discovered Evidence*

■■■ Rogers argues that the trial court erred by denying her Motion for Relief from Judgment under T.R. 60(B) on the grounds of newly discovered evidence. Rogers contends that the newly discovered evidence, which by due diligence could not have been discovered in time for a motion to correct error, supports the granting of a new trial. The newly discovered evidence on which Rogers relies in her motion consists of three documents and is as follows: (1) the public statement of Bennett S. LeBow (LeBow), the director of Liggett Group, Inc., made on or about March 21, 1997, (2) a deposition given by LeBow on June 24, 1997, in another case, and (3) Liggett's October 15, 1997 "Response to Plaintiff's Request for Admissions." Each document was offered for the purpose to show that LeBow admitted that he believes smoking is addictive and is a cause of lung cancer. The public statement made by LeBow is as follows:

*Brooke Group Ltd.* today said its Liggett Group tobacco subsidiary, through its Director Bennett S. LeBow, issued the following statement pursuant to its previously announced settlement agree-

ments with the Attorney General and class action and individual plaintiffs:

"I am, and have been for a number of years, a Director of Liggett Group Inc., a manufacturer of cigarettes. Cigarettes were identified as a cause of lung cancer and other diseases as early as 1950. I, personally, am not a scientist. But, like all of you, I am aware of the many reports concerning the ill effects of cigarette smoking. We at Liggett know and acknowledge that, as the surgeon [sic] General and respected medical researchers have found, *cigarette smoking causes health problems, including lung cancer,* heart and vascular disease and emphysema. We at Liggett also know and acknowledge that, as the Surgeon General, the Food and Drug Administration and respected medical researchers have found, *nicotine is addictive.*

*Liggett will continue to engage in the legal activity of selling cigarettes to adults, but will endeavor to ensure that these adult smokers are aware of the health risks and addictive nature of smoking.*"

(R. 403, emphasis added).

On August 23, 1996, the trial court entered judgment on the jury verdict in favor of the Defendants. On September 23, 1996, Rogers filed the praecipe. On or about March 21, 1997, LeBow issued the public statement on behalf of Liggett Group, Inc. admitting that nicotine is addictive and cigarette smoking causes health problems, including lung cancer. On June 13, 1997, Rogers initiated the appeal by filing the Record of Proceedings with this court. On July 2, 1997, Rogers filed with this court a verified Petition for Leave to File Motion for Relief from Judgment Under Trial Rule 60(B). On August 5, 1997, this court granted Rogers' petition and remanded the case to the trial court for the purpose of Rogers filing therein her Motion for Relief from Judgment. On August 22, 1997, Rogers filed in the trial court her Motion for Relief from Judgment

under Trial Rule 60(B). Although Rogers' motion did not specify any of the eight reasons listed in T.R. 60 as grounds for a trial court to relieve a party from the entry of final judgment, it is clear from Rogers' motion and appellate brief that she relies on the newly discovered evidence provision of T.R. 60(B). On July 17, 1998, the trial court denied Rogers' motion.

Rogers argues that LeBow's post-trial admission was newly discovered evidence that warranted relief from judgment and a new trial. Rogers contends that there was no evidence at trial consisting of admissions by a tobacco manufacturer that cigarette smoking is a cause of lung cancer or that nicotine is addictive. Moreover, at trial the Defendants jointly challenged any opinions of the cancer causing and addictive qualities of cigarettes, and also introduced expert testimony dispelling Rogers' claims with respect to the damages of cigarette smoking.

Essentially, Rogers argues that Liggett's admissions by LeBow were directly contrary to Liggett's position taken throughout the course of the litigation. Further, the evidence indicates that before the second trial, LeBow came to the conclusion that cigarettes are addictive and cause lung cancer; however, he maintained a contrary position throughout the second trial. Thus, Rogers asserts that the newly discovered evidence of LeBow's statement would significantly bolster her contention that nicotine is addictive and that Richard was an addicted smoker who developed lung cancer from cigarette smoking.

The burden is on the movant to establish the grounds for T.R. 60(B) relief. *McIntyre v. Baker,* 703 N.E.2d 172, 174 (Ind.Ct.App.1998). It is clear that newly discovered evidence is a ground for relief under T.R. 60(B)(2). The movant has the burden of demonstrating that such evidence by due diligence could not have been discovered in time to move for a motion to correct errors under Rule 59.

*Id.* Under Trial Rule 59 a motion to correct errors must be filed not later than thirty days after judgment. It is true that "[a]ny ... issue which was raised by, or could have been raised by a timely motion to correct errors and a timely direct appeal may not be the subject of a motion for relief from judgment under T.R. 60." *Snider v. Gaddis,* 413 N.E.2d 322, 326 (Ind.Ct. App.1980). This is because T.R. 60(B) is meant to afford relief from circumstances which could not have been discovered during the period a motion to correct error could have been filed; it is not meant to be used as a substitute for a direct appeal or to revive an expired attempt to appeal. *Id.* at 324.

▮▮▮▮▮ In the case of newly discovered evidence, the movant "must establish that the evidence is material and relevant, that it is not cumulative, and that it will probably produce a different result." *Cullison v. Medley,* 619 N.E.2d 937, 945(Ind.Ct.App.1993). A motion made under subdivision (B) of T.R. 60 is addressed to the "equitable discretion" of the trial court; the grant or denial of the T.R. 60(B) motion "will be disturbed only when that discretion has been abused." *Fairfield v. Fairfield,* 538 N.E.2d 948, 949–50 (Ind.1989). In making the decision, the trial court is required to "balance the alleged injustice suffered by the party moving for relief against the interests of the winning party and society in general in the finality of litigation." *Chelovich v. Ruff & Silvian Agency,* 551 N.E.2d 890, 892 (Ind. Ct.App.1990). "Abuse of discretion will be found only when the trial court's action is clearly erroneous, that is, against the logic and effect of the facts before it and the inferences which may be draw therefrom." *Fairfield,* 538 N.E.2d at 950.

Defendants argue that the trial court did not abuse its discretion in denying Rogers' T.R. 60(B) motion because Rogers failed to demonstrate any abuse of discretion by the trial court in denying the motion.

Defendants concede that the documents on which Rogers relies for her newly discovered evidence claim establish that LeBow made admissions that he believes smoking is addictive and causes lung cancer. However, Defendants argue that these same documents reflecting the statements made by LeBow on which Rogers relies, were made pursuant to and required by the settlement of other tobacco litigation. First, Defendants contend that the motivation for LeBow's public statement is made apparent from the following sentence: "In accordance with our settlement agreements, Liggett agrees to fully cooperate with the Attorneys General and Settlement Class Counsel in their lawsuits against other tobacco companies." (R. 403). Second, Defendants argue that LeBow's deposition, which was taken on June 24, 1997, was taken for a different case pending in a Florida state court and amounts to hearsay in the case at hand. Finally, Defendants argue that Liggett's Responses are dated October 15, 1997, and post date the August 1996 trial date.

Rogers initiated discovery pursuant to Trial Rule 60(B) following the filing of her Motion for Relief from Judgment by requesting responses from Liggett to her requests for admissions. Liggett's relevant responses to Rogers' requests for admissions are as follows:

*REQUEST NO. 1:* That each of the following documents, exhibited with this request, is a correct and true copy and is genuine:

 a. Exhibit 1, Sworn Deposition of Bennett LeBow given on June 24, 1997.

 b. Exhibit 2, Statement of Bennett S. LeBow dated March 21, 1997.

\* \* \*

*REQUEST NO. 4:* Nicotine is addictive.

*RESPONSE:* Liggett admits that, as the Surgeon General, the Food and Drug Administration and respected medical researchers have found, nicotine is addictive.

*REQUEST NO. 5:* Cigarette smoking is a cause of lung cancer.

*RESPONSE:* Liggett admits that, as the Surgeon General and respected medical researchers have found, cigarette smoking causes health problems, including lung cancer.

(R. 756, 761–62). Defendants do not attack the substance of the Responses, but instead, they contend that the responses concerning nicotine and lung cancer were not related to any time frame and were made and effective more than a year after judgment was entered on August 26, 1996.

Nevertheless, Rogers argues that the newly discovered evidence consisting of all three documents warranted relief from the judgment and a new trial because: (1) the evidence is admissible, (2) the evidence is relevant and material, (3) the evidence is not cumulative, (4) the evidence concerns facts which were in existence at the time of trial, (5) Rogers did not fail to exercise due diligence to discover the evidence, and (6) the evidence would alter the outcome of the trial.

First, Rogers claims that LeBow's statement and deposition testimony are admissible because they constitute the statement of a party opponent under Ind. Evidence Rule 801(d)(2). Specifically, Rogers argues that under Evid.R. 801(d)(2)(A) LeBow's statement was made on behalf of Liggett in his representative capacity. Further, Liggett has manifested an adoption or belief in its truth under subpart (B), as evidenced by Liggett's Responses to Rogers' Requests for Admissions. Additionally, Rogers claims that LeBow's statement falls under the scope of subpart (C) because the statement was made by a person authorized by Liggett to make the statement, and also under subpart (D) because the statement was made by LeBow, as Liggett's agent, concerning a matter within the scope of the agency and made during the existence of the agency relationship. Finally, Rogers asserts that LeBow's deposition testimony is admissible under Ind. Trial Rule 32(A) for the use of

deposition and as former testimony under Evid.R. 804(b)(1).

However, Defendants argue that the newly discovered evidence was neither admitted nor admissible into evidence. Specifically, Defendants claim that although Rogers filed the three documents with the trial court, the trial court never admitted into evidence any of the documents, and Rogers never attempted to read into the Record any portion of LeBow's deposition or Liggett's Responses. Therefore, because she failed to introduce any evidence supporting her motion, Rogers cannot claim error in the denial of the motion because Rogers, as the movant bears the burden of establishing the existence of valid grounds for relief and her motion under T.R. 60(B)(2) must be supported by evidence admitted into the Record.

Further, Defendants argue that Rogers' "shotgun approach" of arguments why LeBow's statement is admissible lacks authority and accuracy. First, we agree with Defendants' contention that T.R. 32(A) has no application to a deposition taken in a lawsuit pending in a court of a different state. Second, Evid.R. 804(b)(1) provides that former testimony is not excluded by the hearsay rule "if the declarant is unavailable as a witness," and Rogers failed to establish that LeBow was unavailable as a witness at trial. Third, Rogers failed to establish that LeBow was authorized in an individual or representative capacity, or by Liggett's entire board of directors to speak on behalf of Liggett as required by Evid.R. 801(d)(2)(A) and (C). Fourth, LeBow's mere personal opinions cannot bind Liggett, and that even if an agency relationship existed; Rogers failed to establish that LeBow spoke to matters within the scope of his agency in order to have the statement admitted under Evid.R. 801(d)(2)(D). Finally, LeBow's statement and deposition is inadmissible under Evid.R. 403 because they were made pursuant to separate litigation at the request of counsel to settle the litigation and avoid bankruptcy. Therefore, we find

substantial evidence to support Defendants' contention that LeBow's statement is inadmissible.

Rogers next argues that the evidence is relevant and material because Liggett's admissions directly contradict Defendants' position taken at trial that nicotine is not addictive. Moreover, Rogers contends that Liggett's admissions are material and relevant to Rogers' allegations regarding the unreasonably dangerous nature of Defendants' products and have a tendency to show that cigarettes are addictive and cause cancer.

However, as we previously discussed, Liggett's Responses to Rogers' Request for Admissions were given more than one year subsequent to the August 1996 trial date. Further, Rogers had the opportunity to request admissions from Liggett before the trial, but failed to perform any discovery with respect to Defendants until she initiated discovery pursuant to Trial Rule 60(B) following the filing of her Motion for Relief from Judgment.

Third, Rogers argues that the evidence is not cumulative because throughout the course of litigation, Defendants neither admitted to nor introduced evidence that nicotine is addictive or cigarettes cause lung cancer, instead, Defendants consistently disputed these contentions. Essentially, Rogers claims that evidence of an admission by a tobacco manufacturer that its product is addictive and causes cancer is evidence that was not available to Rogers and was not introduced by Defendants at trial.

However, Defendants argue in response that the evidence was cumulative and provide a laundry list of the cumulative nature of evidence introduced by Rogers to support her contention that Defendants knew of and admitted to the addictive and carcinogenic nature of their produce, including: (1) Rogers read to the jury the deposition of the former President of the American Tobacco Company who agreed that smoking is associated with lung cancer and that twenty-five years ago it was

associated with lung cancer statistically, (2) Rogers' exhibits containing charts and graphs, depicting the cancer causing ingredients of cigarettes and the statistical relationship between smoking and lung cancer, and (3) Rogers' expert witness who testified that medical and scientific literature stated that cigarettes are addictive and cause lung cancer.

Fourth, Rogers argues that the evidence concerns facts that were in existence at the time of trial. Specifically, Rogers contends that although LeBow made the statement after the end of the second trial, he based his statement on knowledge from research and findings that were in existence before the trial. Moreover, Rogers asserts that Liggett, by its own admission, and LeBow, by his deposition, knew of the addictive nature of cigarettes before the commencement of the second trial.

However, Defendants argue that it is of no matter that LeBow's statement were based upon information and documents that he found and researched prior to the commencement of the second trial. Instead, Defendants contend that the documents upon which Rogers relies for her motion were not in existence at the time of the trial in August 1996.

Next, Rogers argues that she did not fail to exercise due diligence to discover the evidence. Specifically, Rogers contends that Defendants consistently disputed the allegations and evidence of the addictive and carcinogenic nature of cigarettes and that prior to Liggett's admission, LeBow's statement, and LeBow's deposition after judgment, Rogers had no reason to believe that a deposition of LeBow or any other representative of Defendants would lead to an admission that Defendants knew or acknowledged Rogers' allegations that nicotine is addictive and cigarettes cause cancer.

However, Defendants argue that Rogers failed to prove that the evidence was not discoverable before trial by the exercise of due diligence. Specifically, Defendants

claim that Rogers bore the burden to demonstrate facts showing that she exercised due diligence to combat the strong presumption that the evidence could not have been discovered before trial. Moreover, Defendants contend that the action commenced in 1987, judgment was entered in 1996, and it is uncontroverted that Rogers took not a single discovery deposition during these nine years. Thus, Rogers failure to demonstrate that the evidence was discoverable before trial by the exercise of due diligence is directly attributable to her failure to take any discovery depositions.

Finally, Rogers argues that the evidence would alter the outcome of the trial because a defense admission that nicotine is addictive and cigarettes cause lung cancer, strengthens Rogers' contention that Richard Rogers was addicted to nicotine and cigarette smoking caused Richard's lung cancer, and weakens Defendants' ability to rebut these contentions.

However, Defendants argue that the jury could have made a general determination that cigarettes cause lung cancer and nicotine is addictive in some people and still have found in favor of the Defendants. As we previously stated, a motion made under subdivision (B) of T.R. 60 is addressed to the "equitable discretion" of the trial court; the grant or denial of the T.R. 60(B) motion "will be disturbed only when that discretion has been abused." *Fairfield*, 538 N.E.2d at 949–50. In making the decision, the trial court is required to "balance the alleged injustice suffered by the party moving for relief against the interests of the winning party and society in general in the finality of litigation." *Chelovich*, 551 N.E.2d at 892. "Abuse of discretion will be found only when the trial court's action is clearly erroneous, that is, against the logic and effect of the facts before it and the inferences which may be draw therefrom." *Fairfield*, 538 N.E.2d at 950. Therefore, it was the discretion of the trial court to determine if the newly discovered evidence would have altered the outcome of the trial by considering the weight that a reasonable trier of fact would give the new evidence while also evaluating its probable impact on a new trial in light of all the facts and circumstances from the original trial. Therefore, based on the evidence before it, we find that the trial court did not abuse its discretion in denying Rogers' Motion for Relief from Judgment based on newly discovered evidence because Rogers failed to satisfy her burden to establish the grounds for T.R. 60(B) relief.

### III. *Jury Instructions*

Next, Rogers claims that the trial court erred by improperly instructing the jury 'on the defense of incurred risk and improperly instructing the jury on the definition of a defective product. Specifically, Rogers argues that the trial court erred in: (1) failing to give her tendered instruction number 7 on the defense of incurred risk, (2) giving final instruction number 30 based on Defendants' tendered instruction number 12, (3) failing to give her tendered instruction number 8, and instead giving final instruction number 15 on the defense of incurred risk, (4) modifying Defendants' tendered instruction number 5 to give it as final instruction number 16 on the defense of incurred risk, and (5) giving final instruction number 12 describing those circumstances in which a product is not defective under the law of strict liability. Essentially, instead of giving Rogers' tendered instructions number 7 and 8, the trial court gave Pattern Instruction number 7.04 as final instruction number 15, gave Pattern Instruction number 5.43 as final instruction number 30, and gave Pattern Instruction numbers 5.43, 6.15, and 7.04 as final instruction number 16.

Rogers tendered instruction number 7 was as follows:

Under the law of Indiana, the defense of incurred risk does not apply unless the actions of the injured person were wholly voluntary. Even when a danger is known and appreciated by the injured person, continued exposure to the danger does not amount to incurring its risk

where there is no reasonable opportunity to escape from it.

If you find the evidence that Richard Rogers did not have voluntary control over his smoking behavior, then you may find that he did not incur the risk of his injuries.

(R. 1447).

Rogers tendered instruction number 8 was as follows:

The Defendants have raised the issue of incurred risk on the part of Richard Rogers. Incurred risk involves a mental state of venturousness on the part of the actor, and it demands a subjective analysis into whether the actor has actual knowledge and voluntarily accepts the risks. The very essence of incurred risk is the conscious, deliberate and intentional embarkation upon the course of conduct with knowledge of the circumstances. It requires much more than the actor's general awareness of a potential for mishap. Incurred risk contemplates acceptance of a specific risk of which the actor has actual knowledge.

(R. 1448).

The trial court's final instruction number 15, which is based on Pattern Instruction number 7.04, is as follows:

At the time of the occurrence being considered, there was in full force and effect in the State of Indiana, a statute which provides in part as follows:

(a) The defenses in this section are defenses to actions in strict liability and tort. The burden of proof of any defense raised in a product liability action is on the party raising the defense.

(b) With respect to any product liability action based on strict liability in tort:

(1) It is a defense that the user or consumer bringing the action knew of the defect and was aware of the danger and nevertheless proceeded unreason-

ably to make use of the product and was injured by it.

(R. 2055).

The trial court's final instruction number 30, which is based on Pattern Instruction number 5.43, is as follows:

The Defendants have asserted the defense of incurred risk with respect to plaintiff's negligence claims. When a person knows of a danger, understands the risk involved, and voluntarily exposes himself to such danger, that person is said to have "incurred the risk" of injury.

In determining whether Richard Rogers incurred the risk, you may consider his experience and understanding, whether he had reasonable opportunity to abandon his course of action, and whether a person of ordinary prudence, under the circumstances, would have refused to continue and would have abandoned the course of action.

If you find that Richard Rogers' conduct in this case he incurred the risk of the alleged lung cancer and subsequent death, then such conduct would constitute fault to be assessed against the plaintiff.

(R. 2071).

The trial court's final instruction number 16, which was based on Pattern Instructions numbers 5.43, 6.15, and 7.04, is as follows:

If you find by a preponderance of the evidence that Richard Rogers knew of the alleged defect in the cigarettes at issue and was aware of the danger, but nevertheless unreasonably proceeded to make use of the cigarettes and was injured thereby, then you may find for the defendants and against plaintiff on her strict liability claims even if you find that the cigarettes were defective and unreasonably dangerous in some respect.

In determining whether Richard Rogers knew of the alleged defects and was aware of the dangers in smoking defen-

dants' cigarettes, you may consider the experience and understanding of Richard Rogers and whether Richard Rogers could have quit smoking and thereby avoided his injuries.

Therefore, if you find that Richard Rogers incurred the risk of his injuries you may find for the defendants and against the plaintiff on her strict liability claim.

(R. 2056).

 Rogers contends that the trial court abused its discretion by refusing two of her tendered jury instructions. The giving of jury instructions is a matter within the sound discretion of the trial court, and we review the court's refusal to give a tendered instruction for an abuse of that discretion. *Elmer Buchta Trucking, Inc. v. Stanley,* 713 N.E.2d 925, 930 (Ind.Ct. App.1999). Generally, we will reverse a trial court for failure to give a tendered instruction if: 1) the instruction is a correct statement of the law; 2) it is supported by the evidence; 3) it does not repeat material adequately covered by other instructions; and 4) the substantial rights of the tendering party would be prejudiced by failure to give it. *Id.*

 Rogers claims that her tendered instruction number 8 is an accurate statement of the law. With respect to tendered instruction number 8, Rogers relies on our decision in *Power v. Brodie,* 460 N.E.2d 1241 (Ind.Ct.App.1984). Rogers contends that her tendered instruction number 8, which tracks the language of the *Power* decision, set forth the principles for the defense of incurred risk that we enunciated in the *Power* case:

... [incurred risk] involves a mental state of venturousness on the part of the actor, and demands a subjective analysis into the actor's actual knowledge and voluntary acceptance of the risk. By definition ... the very essence of incurred risk is the conscious, deliberate and intentional embarkation upon a course of conduct with knowledge of the

circumstances. It requires much more than the general awareness of a potential for mishap. Incurred risk contemplates acceptance of a specific risk of which the plaintiff has actual knowledge. While the failure to recognize a danger or risk readily discernible to the reasonable and prudent man under like or similar circumstances may constitute contributory negligence, it cannot be said to constitute incurred risk because it should never be considered a voluntary incurrence of a known risk.

*Id.* at 1243. Further, Rogers argues that her tendered instruction number 8 is supported by the evidence because: (1) Richard's continued smoking was a result of his compulsion to sustain an addiction to nicotine and did not involve a spirit of venturousness, (2) there was evidence that Richard was addicted to smoking and did not have a true choice or control over his continued smoking, (3) there was evidence that Richard's continued smoking was not a conscious, deliberate, and intentional embarkation upon the course of conduct with knowledge of the circumstances, and (4) Richard became addicted to cigarette smoking before he had the knowledge and understanding of the specific risk that smoking could become an addiction, rather than merely habit forming, and could cause cancer.

Next, Rogers claims that the substance of tendered instruction number 8 was not covered by other instructions. Specifically, Rogers argues that final instructions number 15 and 16 did not explain the mental state required for a finding of incurred risk and failed to advise the jury that incurred risk involves knowledge and acceptance of a specific risk and a voluntarily exposure to that risk, rather than a general awareness of a potential for harm. Essentially, Rogers asserts that because Richard testified regarding his uncertainty about the health hazards of smoking and his awareness of the tobacco industry's challenge to the Surgeon General's scientific evidence, and because of Defendants'

evidence that nicotine is not addictive and smoking has not been proven to cause cancer, the final instructions did not sufficiently explain the necessity for Richard's specific awareness of the risk of smoking. Further, Rogers contends that the final instructions failed to focus on the distinction drawn in our previous decision in this case between knowledge of potential health risks associated with smoking and knowledge of the specific risks of addiction with respect to the defense of incurred risk. Therefore, Rogers argues that the final instructions failed to address the fact that in order for Richard to have incurred the risk of smoking cigarettes, he must have known and voluntarily accepted the specific risks of smoking rather than knowing and having a general awareness of the potential health risks of smoking.

Rogers also claims that her tendered instruction number 7 is an accurate statement of the law. With respect to tendered instruction number 7, Rogers relies for her argument on our supreme court's decision in *Get–N–Go, Inc. v. Markins*, 544 N.E.2d 484 (Ind.1989). Rogers contends that her tendered instruction number 7 set forth the principle enunciated by our supreme court in the *Get–N–Go* case that actions must be wholly voluntary in order to establish a successful defense of incurred risk:

> When incurred risk is at issue, the question often arises whether the plaintiff could or should have retreated once the danger and risk became apparent. We have held that even when a danger is known and appreciated, continued exposure does not amount to incurring its risk when there is no reasonable opportunity to escape from it or the exposure is a result of influence, circumstances, or surroundings which are a real inducement to continue despite the danger.

*Id.* at 487. In that case, our supreme court considered whether the plaintiff had incurred the risk of injury by continuing to walk across the defendant's icy parking lot. *Id.* at 485. The plaintiff was an elder-

ly diabetic woman who needed to buy food to take with her medication for her illness. *Id.* The plaintiff took several steps into the parking lot before realizing that she was surrounded by ice, at which point she was faced with the option of turning back or continuing toward the store, both of which involved walking on the dangerous ice. *Id.* The plaintiff continued toward the store, slipped on the ice, and injured her knee. *Id.* at 486. The Court recognized that the plaintiff was trapped by the ice and had no choice but to expose herself to the danger of slipping on the ice. *Id.* at 487. The Court further reasoned that the plaintiff was close to the store and in dire need of food, thus, the Court found that her actions were not wholly voluntary, stating that:

> [S]he was on the more dangerous areas of Get–N–Go's parking lot before she became aware of [the ice]. At that point, she made a decision to continue since she was so close to the store and had a real need for food ... As in *Hollowell* [*v. Midwest Smorgasbord, Inc.*, 486 N.E.2d 16 (Ind.Ct.App.1985)] and *Ridgway* [*v. Yenny*, 223 Ind. 16, 57 N.E.2d 581 (1944)], this was a real inducement for her to continue toward the store and thus relieved her of any responsibility for her injuries that she may have sustained by continued exposure to the dangerously icy parking lot since her actions were not wholly voluntary.

*Id.* at 488 (citations omitted). Thus, Rogers argues that the trial court erred in failing to give her tendered instruction number 7, which contained "wholly voluntary" language, because the principle that actions must be wholly voluntary in order to constitute incurred risk is well established in Indiana law.

On the other hand, Defendants argue that the trial court committed no error by refusing to give Rogers tendered instructions number 7 and 8 and by not including the "wholly voluntary" language in the final instructions for the defense of incurred risk. Specifically, Defendants contend

that Rogers misapplies and misstates Indiana law regarding the defense of incurred risk.

Defendants argue that the trial court in *Get–N–Go* did not use the words "wholly voluntary" to instruct the jury on the defense of incurred risk. Moreover, Defendants contend that the supreme court, in reviewing that case, determined that the plaintiff's actions were not wholly voluntary in the context of an individual voluntarily choosing to expose oneself to danger in the face of no alternative but to do so. Put more simply, the plaintiff in *Get–N–Go* knew and was aware of the danger but had no choice but to incur the risk of the danger. Therefore, Defendants assert that it is clear from the Court's reasoning in *Get–N–Go* that it used the "wholly voluntary" language to emphasize the fact that the plaintiff's actions were not "wholly voluntary" because she had no physically safe means of avoiding the danger because both alternatives put her in harm's way. Defendants reiterate their argument by distinguishing between personal circumstances that make a particular course of conduct compelling, and external forces that effectively eliminate all safe alternatives, thereby negating the element of voluntariness and warranting a finding that a plaintiff did not incur the risk at issue.

Richard Rogers had the safe alternative of quitting smoking in the 1960s when he was aware of the potential dangers of smoking including the risk of lung cancer and addiction. Moreover, we agree that Rogers misapplies the law by relying on *Get–N–Go* for the proposition that an instruction on the defense of incurred risk in this case must include "wholly voluntary" language. Furthermore, Richard Rogers' action of continuing to smoke was not an external force that effectively eliminated all other safe alternatives as in *Get–N–Go,* but instead, his actions were personal circumstances that made his conduct of continuing to smoke more compelling.

Rogers reiterates her arguments she made in support of her contention that the trial court erred in failing to give her tendered instructions number 7 and 8 to argue that the trial court also erred in giving its final instructions number 15, 16, and 30. Specifically, Rogers argues that final instructions number 15, 16, and 30:(1) fail to incorporate the principle from *Get–N–Go,* that incurred risk contemplates the acceptance of a specific risk rather than a general awareness of potential for mishap, (2) fail to reference the requirement of a mental state of venturousness involving a conscious, deliberate, and intentional course of conduct with knowledge of the circumstances, and (3) make no reference to whether Richard's conduct was wholly voluntary.

However, we find that the trial court properly instructed the jury on the defense of incurred risk because the instructions properly informed the jury of the defense of incurred risk by using Pattern Jury Instructions for incurred risk with respect to negligence and strict liability in tort. Moreover, the entirety of the final instructions properly instructed the jury that in order for Richard to have incurred the risk of smoking, Richard must have known of the dangers of smoking, understood the risk involved, and voluntarily exposed himself to this known risk. Further, the instructions as a whole informed the jury that it was free to consider Richard's inability to quit smoking.

Finally, Rogers argues that the trial court erred by giving final instruction number 12 in describing those circumstances in which a product is not defective under the law of strict liability. The relevant portion of the trial court's final instruction number 12 on the meaning of a defective product is as follows:

> At the time of the occurrence being considered, there was in full force and effect in the State of Indiana a statute that provides as follows:
>
> * * *
>
> (c) A product is not defective under this chapter if it is safe for reasonably ex-

pectable handling and consumption. If an injury results from handling, preparation for use, or consumption that is not reasonable expectable, the seller is not liable under this chapter.

(d) A product is not defect under this chapter if the product is incapable of being made safe for it reasonably expectable use, when manufactured, sold, handled, and packaged properly.

(R. 2051–52). Specifically, Rogers contends that the trial court erred by including subpart (c) and (d) because the instruction set forth an issue not supported by the evidence. Rogers further argues that including subpart (c) was improper because there was no evidence that the use of the defendants' cigarettes in this case was not "reasonably expectable," but instead, the evidence indicated that Richard used the defendants' cigarettes as they were intended to be used. Further, Rogers contends that including subpart (d) of final instruction number 12 was also improper because there was no evidence that the defendants' cigarettes were incapable of being made safe for their reasonably expectable use when manufactured, sold, handled, and packaged properly.

■ Defendants counter Rogers' argument by claiming that subpart (c) and (d) are in fact supported by the evidence. We agree. With respect to subpart (c), there was evidence permitting the jury to decide whether Defendants' cigarettes were "safe for reasonably expectable handling and consumption." Specifically, the jury heard evidence that despite Richard's awareness of the risk of addiction and lung cancer, he chose to continue smoking. Moreover, it could be inferred that Richard's two to three pack a day smoking conduct, in the face of known serious health risks, was not reasonably expectable consumption. With respect to subpart (d), there was evidence that Defendants' cigarettes conformed to the generally recognized state of the art. Therefore, the trial court properly gave final instruction number 12 regarding the definition of a defective product.

## IV. *Exclusion of Evidence*

### *Standard of Review*

■ The admission or exclusion of evidence is a matter of discretion for the trial court. *Sears Roebuck and Co. v. Manuilov,* 715 N.E.2d 968, 978 (Ind.Ct. App.1999). This Court will reverse a trial court's decision only if it abuses its discretion; "that is, only when the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances." *Id.* The erroneous exclusion of evidence requires reversal "only if the error relates to a material matter or substantially affects the rights of the parties." *Id.;* see also Ind.Evidence Rule 103(a). "Any error in the admission of evidence is harmless if the same or similar evidence is submitted without objection." *Homehealth, Inc. v. Northern Indiana Public Service Co.,* 600 N.E.2d 970, 974 (Ind.Ct. App.1992). In determining the admissibility of evidence, the reviewing court will only consider that evidence in favor of the trial court's ruling and unrefuted evidence in the defendant's favor. *Reaves v. State,* 586 N.E.2d 847, 857 (Ind.1992).

■ We further note that all relevant evidence is admissible, except as provided by statute or rule; evidence that is not relevant is inadmissible. Ind.Evidence Rule 402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind.Evidence Rule 401. As a final consideration, otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Evid.R. 403.

■ "In ruling on the relevancy of evidence, the trial court is accorded wide latitude to determine the probative value of evidence in contrast to its prejudicial impact." *Barnes v. Barnes,* 603 N.E.2d

1337, 1343 (Ind.1992). "However, relevant evidence—that which logically tends to prove a material fact—is not inadmissible simply because of its prejudicial impact." *Id.* "It is only when the evidence is merely marginally relevant that the trial court has discretion to exclude it by balancing the probative value against the prejudicial impact." *Id.*

## A. *Deposition of William L. Dunn, Jr.*

First, Rogers argues that the trial court erred by excluding the deposition of William L. Dunn, Jr. (Dunn). Specifically, Rogers contends that Dunn's deposition testimony is evidence relevant to Philip Morris' understanding of the design of cigarettes, the effects of nicotine, and the role that nicotine plays in smoking.

Prior to the second trial, on July 3, 1996, Rogers filed a Designation of Testimony from a Deposition of William L. Dunn, Jr., which was taken in the case of *Cipollone v. Liggett Group, Inc., et al.,* on November 20, 1987, in Richmond, Virginia. Rogers attached to her Designation a copy of the deposition and the document "Motives and Incentives in Cigarette Smoking" which was Exhibit 21 to the deposition. On July 25, 1996, Rogers filed a Memorandum Concerning Designated Deposition Testimony of William Dunn. In the memorandum, Rogers summarized the designated portions of Dunn's deposition including: his employment with Philip Morris at the time of his deposition; his responsibility to research the psychology of smoking; and his identification and acknowledgement of a paper he presented in 1972 entitled, "Motives and Incentives of Smoking." Thus, Rogers argues that Dunn's deposition testimony is relevant because Dunn, as an employee of Philip Morris, was part of the Research and Development Department, responsible for researching the motivating forces causing people to smoke. Further, he prepared and presented a paper on this subject in 1972 at a conference comprised of international chemists and scientists working in the cigarette and to-bacco industries, representing a clear understanding, as a representative of Philip Morris, of the role of nicotine in cigarettes.

After reviewing the deposition and hearing argument by counsel, the trial court excluded the deposition in its entirety finding that the evidence was insufficient to provide a sufficient basis for the admission of the deposition testimony:

As you read the whole deposition, there is a lot about the paper that Mr. Dunn does not recall and is asked to read portions of the document.... As the deposition progresses, it's really difficult at times—when it's being proffered for a statement that was made, it's complicated by the fact that the witness doesn't remember quite a few things.... As you look at the whole document ... the nature of this witness' testimony is to form a basis for the content of the documents ... what the witness characterized it to be ... as a way of thinking that might generate research at a conference ... that what is being proposed for is a statement of, in fact, Philip Morris, in my opinion, in reading the deposition as a whole, it fails to, under the rules of Indiana—Indiana Rules of Evidence, I think it fails to sufficiently set forth and present evidence that would be an opinion theory or hypothesis of Philip Morris. It appears to be, at best, taken as a whole, truly what this witness characterized it to be, and that is a hypothetical presentation, and certain proposals are based upon apparently his research of the current literature ... I believe the evidence is simply insufficient to provide a sufficient basis for the admission of the deposition designated of William L. Dunn, Jr.

(R. 4106–4109).

Based upon the trial court's finding, we find that the trial court properly excluded Dunn's deposition testimony on the basis that the documents he relied upon in his deposition merely contain theories and hypotheses, and there is no basis for concluding that Dunn's theories or hypotheses

were adopted or attributed to Philip Morris or any other defendant. Thus, Dunn's deposition testimony cannot provide the requisite evidentiary foundation to support the admissibility of this designated deposition testimony as an admission of Defendants.

### B. *Exhibits 39–53*

Next, Rogers argues that the trial court erred by excluding her tendered exhibits 39–53 which consisted of documents relating to the activities of the Tobacco Industry Research Committee (TIRC). Specifically, Rogers contends that the documents indicate that the tobacco companies formed the TIRC as a research committee for the purpose of launching a public relations campaign to influence public perception of the health hazards of smoking.

At the second trial, Rogers offered into evidence exhibits 39–53 which consisted of redacted portions of certain TIRC documents offered at the first trial. Rogers offered those portions of the documents referencing public relations activities that TIRC planned and carried out. In support of the offer, Rogers argued that the evidence was relevant to the issue of consumer expectations regarding the manner in which public dissemination by tobacco companies affected the public's expectations regarding the effects of smoking.

Defendants objected to the admission of the exhibits and the court sustained Defendants' objection and ruled that exhibits 39–53 did not pass the balancing test for admissibility under Evid.R. 403.

Defendants argue that the trial court did not abuse its discretion by excluding Rogers' proffered exhibits because the documents do not provide sufficient foundation on their face, nor did Rogers produce sufficient extrinsic evidence to lay a foundation establishing their relevance. Specifically, Defendants claim that Rogers failed to explain how these documents of non-parties are relevant to consumer expectations because they are internal memorandum, and not public statements that could have affected consumer expectations.

Nevertheless, Rogers argues that the documents describe the public relations activities of the TIRC acting on behalf of the defendant tobacco companies and set forth the philosophy and purpose of the TIRC that guided the tobacco companies' subsequent efforts to impact the public perception of the health consequences of smoking. Further, Rogers contends that the documents are relevant to the issue of what consumers understood with respect to the health hazards of smoking during the period referenced in the documents.

However, Rogers failed to offer the public statements that a consumer may have seen as a result of these documents. Instead, Rogers offered the internal memorandum of a non-party with no evidence suggesting that any consumer ever saw these documents. Thus, the trial court properly concluded that the exhibits probative value was outweighed by the risk of prejudice to Defendants that the jury would consider them as a claim by Rogers that Defendants misled the public.

### C. *Exhibit 61*

Next, Rogers argues that the trial court erred by excluding her tendered exhibit 61, which is a letter dated February 5, 1958, from the President of The American Tobacco Company, addressed to John W. Hill of Hill & Knowlton, Inc. The substance of the letter discusses the views of the directors of the Tobacco Institute on certain policy questions in order to formulate the public relations policies of the Tobacco Institute. Rogers argues that the document is relevant to the issues at trial including the negligence of Defendants, their failure to warn of the harmful effects of their product, consumer expectations of the dangers associated with Defendants' product, and Richard's alleged incurred risk. Specifically, Rogers contends that this document is evidence of Defendants' views regarding the industry's public response to the developing evidence and information that tobacco prod-

ucts are harmful by setting forth advice of how to counter the medical and scientific reports of health hazards associated with cigarette smoking.

Defendants objected that the document was simply a letter concerning the proposed opinions of a non-party, lacked any foundation linking it to Defendants, lacked any inference that the proposals were ever carried out having any affect on consumer expectations, was irrelevant, and had the ability to confuse and mislead the jury. The trial court sustained Defendants' objection without explanation.

Again, we find that the trial court did not abuse its discretion by excluding Rogers' proffered exhibits because the document does not provide sufficient foundation for admission, and Rogers did not produce sufficient extrinsic evidence to lay a foundation establishing its relevance.

### D. *Requests for Admissions*

■ Finally, Rogers argues that the trial court erred by refusing to allow her to read Philip Morris' Responses to Rogers' Requests for Admissions Number 9 and 4.

Rogers' tendered Exhibit 63 offering these documents is as follows:

*REQUEST No. 9:* One or more individuals employed by defendant Philip Morris Inc. prepared a document during or after the year 1992 which contained the following language:

Different people smoke for different reasons. But the primary reason is to deliver nicotine into their bodies. Nicotine is an alkaloid derived from the tobacco plant. It is a physiologically active, nitrogen containing substance. Similar organic chemicals include nicotine, quinine, cocaine, atropine and morphine. While each of these substances can be used to affect human physiology, nicotine has a particularly broad range of influence.

*RESPONSE:* Philip Morris admits that the original document, prepared in 1992 by a non-scientist employee at Phil-

ip Morris, included essentially the same language which itself was quoted or paraphrased from publicly available sources.

*REQUEST No. 4:* The information in the document was presented to and/or was made available to management employees of defendant Philip Morris Incorporated.

*RESPONSE:* Philip Morris objects to this request on the grounds that it is vague, ambiguous, unlimited as to time, and contains undefined terms. Subject to, and without waiving its objections, Philip Morris admits that the original document was found in the files of certain Philip Morris management level employees.

(R. 4805).

Defendants objected to allowing the jury see or hear the admissions, and the court sustained the objection for lack of foundation. The trial court reasoned that although the document was drafted by a Philip Morris employee and found in Philip Morris' management files, the foundation for admitting the documents was lacking because Rogers could not identify with particularity the Philip Morris employee who wrote the document. Moreover, the trial court excluded the admissions because Rogers failed to lay a sufficient foundation showing that the unidentified person who wrote the document had the expertise or authority to speak on behalf of Philip Morris in order for the statement to be an admission of Philip Morris.

As we previously stated, in determining admissibility of evidence, we will only consider that evidence in favor of the trial court's ruling. *Reaves,* 586 N.E.2d at 857. Therefore, because there is sufficient evidence to support the trial court's decision to exclude the requests for admission, we find that the trial court properly excluded the documents.

### V. *Denial of Motion to Amend Complaint*

Rogers argues that the trial court erred by denying her Motion to for Leave to File Second Amended Complaint for Damages.

Rogers filed her Complaint for Damages on March 27, 1987. On October 2, 1987, Richard Rogers died. On March 24, 1988, Rogers filed her first Amended Complaint for Damages. On December 2, 1993, Rogers filed a Motion for Partial Summary Judgment seeking a determination of law that the distribution of cigarettes for consumption is an abnormally dangerous activity calling for the application of the doctrine of absolute liability under Indiana law. On April 26, 1994, the trial court denied Rogers' Motion for Partial Summary Judgment. The first trial was scheduled to commence on January 31, 1995. On November 4, 1994, over seven years after Rogers filed her initial complaint and over six years after Rogers filed her first amended complaint, Rogers moved for leave to file her Second Amended Complaint for Damages to include her previously briefed and argued theory that the distribution of cigarettes constituted an abnormally dangerous activity. On December 1, 1994, the trial court denied Rogers' motion and found as follows:

1. Plaintiff has offered no explanation only [sic] she waited to formally amend her Complaint until November 4, 1994, has then [sic] 90 days before trial is to commence therefore [sic] this cause has been pending since 1987.

2. This Court's denial of Plaintiff's Motion for Partial Summary Judgment on April 26, 1994 also held, in the absence of cross-motions for summary judgment, that "... Plaintiff has failed to show she is entitled to judgment as a matter of law."

3. The "abnormally dangerous activity doctrine" has no application as an independent foundation of liability, to the issues, facts and applicable law of this cause of action.

(R. 198).

"Amendments to the pleadings are to be liberally allowed in order that all issues involved in a lawsuit are presented to the jury." *Fleming v. International Pizza Supply Corp.*, 707 N.E.2d 1033, 1036 (Ind.Ct.App.1999). However, "[t]he trial court has broad discretion in granting or denying amendments to the pleadings and we will reverse only upon a showing of abuse of discretion." *Id.;* See also, *Freedom Express, Inc. v. Merchandise Warehouse Co., Inc.,* 647 N.E.2d 648 (Ind.Ct. App.1995). "An abuse of discretion is an erroneous conclusion and judgment, clearly against the logic and effect of the facts and circumstances before the court or the reasonable deductions to be drawn therefrom." *Id.* at 653.

Trial Rule 15(A) provides that a complaint may be amended by leave of the trial court and that the trial court should grant such leave "when justice so requires." T.R. 15(A). In *Palacios v. Kline,* 566 N.E.2d 573 (Ind.Ct.App.1991), this court articulated several factors to which a trial court should look in determining whether justice requires the leave to be granted. Those factors include undue delay, bad faith, or dilatory motive on the part of the movant and undue prejudice to the opposing party. *Id.* at 575. The trial court noted that Rogers moved to amend her complaint over seven years after her original complaint and only 90 days before trial was to commence. It was reasonable to assume that such delay is undue. The court further noted that the "abnormally dangerous activity doctrine" has no application as an independent foundation of liability in this case. Given the deference we must give to the trial court's decision, we cannot say that there was an abuse of discretion.

### CONCLUSION

Based on the foregoing, we find that the trial court judge committed reversible error by failing to notify the parties that he advised the jury, at the jury's request during deliberations, that it could hold a press conference following the reading of the verdict. The trial court properly denied Rogers' Motion for Relief from Judgment based on newly discovered evidence

under T.R. 60(B). The trial court properly instructed the jury on the defense of incurred risk and on the meaning of "defective product." The trial court properly excluded certain evidence and did not err by denying Rogers' Motion to Amend her Complaint to include a claim that the Defendants were engaged in an abnormally dangerous activity.

Affirmed in part, reversed in part, and remanded for further proceedings in accordance with this opinion.

KIRSCH, J., concurs.

SHARPNACK, C.J., concurs in part and dissents with opinion.

SHARPNACK, Chief Judge, concurring in part and dissenting.

I concur with the majority opinion on all points except the one on which it reverses. As to that, I respectfully dissent because I believe the presumption of harm has been rebutted. Moreover, I do not agree with the majority that we cannot review the effect of the communication with the jury because we may not consider the comments of the jurors as reflected in the Wall Street Journal article. I agree that we may not consider the comments; however, we need not consider them in determining whether the presumption of harm has been rebutted.

As we all agree, ex parte communications between judge and jury are error and are presumed prejudicial. *Smith v. Convenience Store Distrib. Co.*, 583 N.E.2d 735, 737–738 (Ind.1992). The impetus behind the rule prohibiting ex parte communications stems from the danger that the judge, albeit unintentionally, may exert extraneous influence over the jury by his or her communication. *Bouye v. State*, 699 N.E.2d 620, 628 (Ind.1998). Thus, the rule is designed to prevent the jury from being improperly influenced by the judge. *Id.*

At one time, any ex parte communication, other than "formal" ones between judge and jury, was reversible error.

*Danes v. Pearson*, 6 Ind.App. 465, 471, 33 N.E. 976, 978 (Ind.Ct.App.1893). The rule now, however, is that although ex parte communication is error and prejudice is presumed, the presumption is rebuttable. *Smith*, 583 N.E.2d at 738. "In deciding whether the presumption of harm has been rebutted, we evaluate the nature of the communication to the jury and the effect it might have had upon a fair determination." *Id.*

Thus, the presumption of prejudice that arises when an ex parte communication between the judge and the jury occurs can be dispelled if, after considering the *nature* of the communication and the effect it *might* have had upon a fair determination, *we* are satisfied that no harm resulted. *See id.* Our consideration need not include evidence of the actual effect on the deliberation. It is *our* assessment that is dispositive. "If ... we are satisfied that no harm resulted, then the judgment will be allowed to stand." *Id.* I am so satisfied.

The instant case is readily distinguishable from *Smith*, the case relied upon by the majority. Here, the communication was indirect and did not involve the presence of the judge in the jury room as in *Smith*. *Compare id. with Danes*, 6 Ind. App. at 471, 33 N.E. at 978 (finding reversible error where the trial judge entered the jury room to communicate with the jury about dinner plans). The communication of the judge to the jury consisted of the single word "yes" in answer to the question of whether the jury could hold a press conference after reaching a verdict, a question that had nothing to do with any of the issues raised at trial. Such communication cannot be said to have induced the jurors "to prove themselves capable of resolving the controversy" as in *Smith*. *Smith*, 583 N.E.2d at 738. Additionally, the communication did not involve any factual or legal issue in the case, and unlike *Smith*, did not convey misinformation.

Finally, and most importantly, the jury deliberated for seven more hours after re-

ceiving approval from the judge to have a press conference. This supports a conclusion that the verdict was not affected by the communication. *See id.* (noting that the passage of a mere ten minutes between the communication by the judge and the return of the jury verdict indicated that the judge's comments may have had an influence on the verdict); *see also Nesvig v. Town of Porter,* 668 N.E.2d 1276, 1288 (Ind.Ct.App.1996) (holding that bailiff's misconduct in answering a question posed by the jury did not create a sudden turn of events so as to suggest that the improper communication had an influence on the verdict where thirty minutes after the improper communication the jury posed another question to the trial court and then another thirty minutes passed before the verdict was returned).

In sum, I am satisfied that no harm resulted and that the presumption of prejudice has been rebutted because the communication was indirect, did not convey misinformation, was issue neutral, and was followed by seven hours of deliberation. There is nothing to suggest that the judge, improperly or otherwise, influenced the jury by the communication. Under these circumstances, we are not justified in going against the jury's verdict, which is otherwise entitled to the presumption that it was the result of deliberations based upon the evidence before the jury and the instructions of the court. *See, e.g., Emerson v. Markle,* 539 N.E.2d 35, 39 (Ind.Ct. App.1989), *trans. denied.*

I would affirm.